## IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF MARYLAND

**JOHN L. BOYLE**                                      *
       **Plaintiff**

                            *

                            *       **Civil Action No.  L-013200**

**HARFORD COUNTY, MARYLAND**              *
 *et al.,*

       **Defendants**       *

        *  *  *  *  *  *  *  *  *  *  *  *  *

## MEMORANDUM IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

Harford County Sheriff Joseph P. Meadows, Howard Walter, Richard Aiello, Colburn Dorsey, Elwood DeHaven, and Gary Sohl ("State defendants"), by J. JOSEPH CURRAN JR., Attorney General of Maryland, and FRANK W. MANN, Assistant Attorney General; and Harford County, by Philip S. Roberts and Deborah S. Duvall, Assistant County Attorneys, file this Memorandum of Law in support of the Motion for Summary Judgment.

## I.     BACKGROUND.

Plaintiff, John L. Boyle ("Boyle"), has filed an Amended Complaint[1] ("Am.Comp.") against Harford County, Harford County Sheriff Joseph Meadows, Howard Walter, Richard Aiello, Colburn Dorsey, Elwood DeHaven, and Gary Sohl in their official and individual capacities.  Boyle's Complaint contains a multitude of vague, duplicative and redundant claims alleging violations of Title VII, 42 U.S.C. § 1983, as well as several state law claims including alleged violations of the Maryland Law Enforcement Officers' Bill of Rights, Chapter 95 of the Harford County Code and wrongful discharge.  In single counts, Boyle

---

[1] Boyle filed his original Complaint in Harford County Circuit Court on September 24, 2001. The case was removed to his Court.

makes confusing references to both state claims of wrongful discharge and federal claims, making it difficult to determine under which theory he is proceeding.

As this Court previously recognized, Boyle's original Complaint was no "model of clarity" and his amended complaint is equally equivocal . In Count I, Boyle seems to assert a separate cause of action under provisions of the Harford County Code, some of which have been judicially determined unconstitutional, alleging "harassment and termination because he disclosed and expressed opposition to illegal and improper conduct" by his supervisors. In Court II, Boyle asserts a non-cognizable "whistle-blower" style claim under Title VII.[2] In Counts III and IV, Boyle claims religious discrimination pursuant to the Establishment Clause of the First Amendment *and* Title VII.  The only difference between Counts III and IV is that Count IV frames the same Establishment Clause allegation as a wrongful discharge claim, alleging various violations of "public policies," many of which have no bearing on the allegations of his Complaint.[3]

In Count V, Boyle appears to make a *Monell* style complaint against Harford County. In Count VI, he appears to reallege his previous claims in Counts II, III, and IV against the State defendants but in their *individual* capacities.  In Count VII, he realleges the claims in Count III and appears to add a charge of hostile work environment pursuant to Title VII.

---

[2] As will be discussed later, Title VII provides no protection or remedy for discrimination and/or retaliation against "whistle-blowers."

[3] For example, Boyle alleges violations of Article 46 if the Equal Rights Amendment. This is a meritless, if not frivolous charge. Article 46 is a gender based provision and Boyle pleads no facts to show he suffered discrimination on the basis of gender.  Boyle also claims a violation of Article 49B of the "Annotated Code of Maryland the Fair Labor Employment Practices Act."  As will be discussed later, this is a non-cognizable claim insofar as there is no separate remedy under Article 49B.

Finally, in Count VIII, Boyle alleges multiple violations under the Law Enforcement Officers' Bill of Rights (LEOBR),[4] Md. Code Ann., Art. 27 § 727 *et. seq.,* "provisions of the Code of, Maryland Regulations (COMAR), and the Harford County Detention Center Policy and Procedures.[5]

## II.   STATEMENT OF UNDISPUTED FACTS.

### A.   Background information.

In July of 1987, John Boyle was hired by the Harford County Sheriff's Office as a Probationary Correctional Officer.  He was promoted to Deputy and eventually to Deputy First Class.  After 1996, he sought no other promotions but continued to receive regular pay increases.  Depo. Tr.; 8:21-9:15.  Am. Comp. at ¶1; Boyle Depo. Tr. 8:4-6; 9:16-10:21; Exhibit ("Ex.") 21, Affidavit ("Aff.") of Richard Aiello; Ex. 22 Aff. of Thomas Golding.

In 1994, Defendant Joseph Meadows was elected Sheriff and became Boyle's employer.  For the three years following the Sheriff's election, Boyle received several formal and informal awards and "commendations," including a 1995 "certificate of Appreciation from [the] Harford County Law Department," (Ex. 12, p.1), a 1996, recognition as "Officer of the Year," and a 1997 commendation for reporting alleged "corruption on [the] 12 to 8 shift."  Ex. 12, p.1.

---

[4] These claims are also non-cognizable. The LEOBR does not apply to Boyle, who had no power to make arrests and thus, did not meet the definition of a "law enforcement officer" pursuant to Article 27, § 727 (b).  However, the Sheriff extended to correctional officer, as a courtesy, a due process mechanism similar to that provided by the LEOBR.

[5] Because, as a correctional officer, Boyle was not subject to State personnel rules, COMAR has no application here. As for alleged violations of "Detention Center Policy Procedures," there are no applicable remedies that can be pursued in this Court.

Boyle was never certified as a law enforcement officer and was not authorized to make arrests. Boyle Depo. Tr. 7:21-8:3. However, as a courtesy, Sheriff Meadows ordered that any correctional officer accused of a serious disciplinary infraction shall be given the option of having disciplinary charges heard in accordance with the basic principles established by the Law Enforcement Officers' Bill of Rights, Md. Code Ann. Art. 27, §§ 727, et seq. ("LEOBR").[6] This means the officer is entitled to a hearing, in which he or she can present evidence and question witnesses. Guilt is determined by a "hearing board" appointed by the agency to consider and weigh evidence. If the board finds the officer guilty, punishment is recommended which the Sheriff may either accept, reject, or modify. *See* Ex. 21; Ex. 22.

### B.      Disciplinary and Conduct Record.

Though Boyle received relatively favorable evaluations during the first ten years of his career, his performance gradually and then rapidly began to decline. While employed at the Sheriff's Office, Boyle was disciplined twice for serious breaches of institutional security rules and insubordination. Prior to that, he was repeatedly counseled for other security breaches and violations of policy. Exhibits 1-7, 10-11. In chronological order, Boyle's disciplinary record is as follows:

---

[6] The LEOBR applies only to  "'[l]aw enforcement officer[s]' ... who, in [their] official capacity, [are] authorized by law to make arrests ..." Md. Code Ann., Art. 27, § 727 (b). Boyle was no such officer and thus, any LEOBR rights he may have had were not enforceable.

4

1.      **Non-adverse employment actions.**

a.      **November 25, 1998 -- Counseling form**.

On November 25, 1998, Boyle received a counseling form for promising to help an inmate obtain a money order in violation of jail policy.  After learning that the inmate was attempting to arrange to have a money order delivered by a relative, Boyle told the inmate he would "do everything [he] could to try to help him."  Ex. 11, p.3.  The Detention Center forbids personnel from accepting or delivering inmate money orders unless received via the U.S. Postal Service. Ex. 11, p. 4, procedure l (2).  Therefore, Boyle's promises were in violation of jail policy.  This counseling form had no effect on Boyle's pay, benefits, job title, or rank. Ex. 21-22.

b.      **December 14, 1998 – Counseling form.**

In August of 1998, Boyle opened two security doors in the medium security dormitory area of the facility at the same time, in violation of Policy 4-200, Security Doors Control. Ex. 1.  Boyle admitted that he opened the doors and that such an act was a violation of policy. Boyle Depo. Tr. 98:11- 99:15.  For this, Boyle received a second written counseling form on December 14, 1998, but was not charged with any disciplinary infraction.  Ex. 1; Boyle Depo. Tr. 98:2-4.  Nor did he suffer any adverse affect on his pay, benefits, job title, or rank. Ex. 21-22.

c.      **December 16, 1998 -- Counseling form**.

On December 16, 1998, Boyle received a third counseling form after he was found to have violated another Detention Center policy by shooting baskets in the jail exercise yard

with maximum security inmates present and an emergency door left unsecured.[7]  Ex. 10.  At

his deposition, Boyle admitted he shot baskets in the yard as alleged in Exhibit 10.  He also

admitted that the emergency door was left open.  Boyle Depo. Tr. 88:7- 18. The counseling

report had no effect on Boyle's pay or benefits.  However, his misconduct was a factor in the

decision to remove Boyle from the regular list of officers assigned to work as the jail

"exercise officer."  Boyle Depo. 87:8-20; Ex. 10; Ex. 21.

### 2.      Adverse employment Actions

### a.      September 25, 2000 – Three-day Suspension.

On February 2, 2000, Boyle was charged with entering the maximum-security inmate

corridor alone, removing an inmate from the maximum-security area ("D" Block) and failing

to close the door to the area with another inmate inside the cell.  Ex. 2.  Boyle also failed to

log the move of the inmate on the special confinement log supplement as required by Policy

2.501, Procedure C3.  Ex. 2.  For this infraction, Boyle was offered a day off without pay and

a written reprimand.  He declined and asked for a hearing.  Ex. 5.

On the day of the hearing, Boyle was offered a postponement but declined.  Boyle

Depo. Tr. 85:3-15.  The hearing board officer in this case was Sergeant Dan Scott, who,

according to Boyle, had no knowledge that Boyle had filed a complaint of "religious

harassment." Boyle Depo. Tr.  229:4-7.  During the hearing, Boyle pled guilty to only one

of the three charges and was eventually found guilty on all three charges. Ex. 6; Boyle Depo.

Tr. 86:1-9.  Boyle waived the opportunity to testify, retain representation, or call witnesses

---

[7] The policy specifically reads: "The exercise Officer or designee shall supervise
inmates at all times in the exercise yard but shall not participate in any recreational
activities."

on his behalf.  Ex. 6.; Boyle Depo. Tr. 86:10-18.  Boyle also declined to make a statement before the discipline was imposed.  Ex. 6.  For his violations, Boyle was suspended for three days by Sheriff Meadows, who acted as the sole decision maker in determining Boyle's punishment . Ex. 2.; Boyle Depo. Tr. 81:11-82:13; *see also* Ex. 21-22.

### b.      October 5, 2000 – Termination of Employment.

On August 15, 2000, an inmate attempted to commit suicide in the maximum-security area, and a call for "all officers" was made.  Ex. 3.  Boyle, along with other deputies, responded to the call.  Ex. 3.  Deputy Kahler sprayed the inmate with pepper spray to subdue him, and he was then removed to the medical area.  Ex. 3.  However, an inmate in another cell, Mr. Buchanan, complained about the pepper spray, and Boyle was advised to take the inmate to the medical facility.  Ex. 3.; Boyle Depo. Tr. 55:14-18.  When Boyle was returning, inmate Buchanan, who was not in restraint, became verbally abusive toward Deputy Kahler because of the use of the pepper spray.  Ex. 3.; Boyle Depo. Tr. 55:19-56:13; 58:2-19.  In order to diffuse the situation and avoid a physical confrontation between the inmate and Deputy Kahler, Corporal Gary Sohl ordered Boyle  to immediately secure the inmate back into his cell.  Boyle refused to do so, stating that it wasn't "his end" and that "he wasn't there."  Ex. 3.; Boyle Depo. Tr. 72:14-20; 73:17-19.  Corp. Sohl repeated his order, but again Boyle refused.  Ex. 3.  For the third time, Corp. Sohl ordered Boyle to place the inmate back into the cell, and Boyle refused again.  Ex. 3.; Boyle Depo. Tr. 57:13-58:1; 65:7-11.  At one point, Corp. Sohl told Boyle that "this is a direct order."  Ex. 3.; Boyle Depo. Tr. 74:19-75:4.

Instead of following the order, Boyle walked away and returned to his previous post. (Ex. 3.); Boyle Depo. Tr. 61:7-18.  Ultimately, Deputy Kahler and Corporal Sohl secured inmate Buchanan back into his cell.  Ex. 3.  For that incident, Boyle was charged with (1)

Conduct/failure to obey a lawful order; (2) Conduct Disrespectful to Superior; (3) Conduct unbecoming; (4) Failure to perform job related duties; and (5) careless, indifferent or negligent performance of job related duties.  Ex. 3; Ex. 21-22.

On September 28, 2000, a hearing was held on the matter with an independent trial board consisting of three members of outside law enforcement agencies from Charles County, Cecil County and Frederick County.  Ex. 3.  No employee from the Harford County Sheriff's Office was part of the trial board and, according to Boyle,  none of the trial board members had prior knowledge that Boyle had previously filed complaints reporting (1) "religious harassment" or (2) "wrongful activity on the part of jail employees. Ex. 3.; Boyle Depo. Tr. 230:14-231:11.  The hearing encompassed almost an entire day and consisted of seven witnesses.  Ex. 3.  Boyle had the opportunity to testify, present witnesses and any other evidence that he believed was relevant.  Ex. 3.  After the hearing, Boyle was found guilty of all charges, and the trial board recommended that Boyle be terminated.  Ex. 3.

The Sheriff of Harford County considered the recommendation of the trial board, Boyle's recent string of disciplinary violations, and Boyle's statement in mitigation. However, the Sheriff, as the sole decision maker in this matter,  upheld the recommendation of the board and terminated Boyle's employment.  Ex. 7.; Boyle Depo. Tr. 82:12-13.

### 3.    Admitted facts regarding adverse employment actions.

With respect to his suspension, Boyle admits that he has no reason to believe the officer who presided over his trial board had any knowledge that Boyle had filed a "religious harassment" complaint.  Boyle Depo. Tr.  229:4-7.  Moreover, Boyle admitted guilt in that case.  Ex. 6.; Boyle Depo. Tr. 86:1-9.  Boyle also admits he waived his right to testify, make a statement in mitigation, or retain representation.  Ex. 6; Boyle Depo. Tr. 86:10-18.

With respect to the incident that resulted in his termination, Boyle admits he was ordered three times by Corporal Sohl to place a hostile, aggressive inmate back in his cell and each time Boyle did not obey.  Boyle Depo. Tr. 57:18-20.  He confirms the trial board finding that the inmate was highly agitated and aggressive toward Officer Kahler.  Boyle Depo. Tr. 55:19-56:13; 58:14-17; 72:7-13. And though Boyle seems to argue that he ignored Corporal Sohl's because he was following a previous "order" to take the inmate to the medical unit, he presents no evidence to show how or why a previous order would "trump" Solh's order when there are changing circumstances.  Moreover, Boyle admits the officer who gave the first "order," did not see the subsequent confrontation between inmate Buchanan and Officer Kahler.  Boyle Depo. Tr. 79:6 -8.

In truth, Boyle admits he followed neither order. Boyle Depo. Tr. 61:1-6.  And he does not deny that he argued with Corporal Sohl by falsely representing that he could not secure the inmate without keys.  Boyle Depo. Tr. 59:3 -12.  As the following clearly illustrates, Boyle had immediate access to keys:

| | |
|---|---|
| Q: | ... did Deputy Kahler say to you, here Jack, you want these keys? |
| Boyle: | Yes, sir.  He must have said that right after I pointed out to Gary Sohl that Deputy Comes, who had the keys, who was working the area a few feet away. |
| Q: | So he offered you his keys? |
| Boyle: | Yes, sir. |
| ... | |
| Q: | Did you take the keys? |
| Boyle: | No, sir. No. sir. |

Boyle Depo. Tr. 289:8-20; 60:5-13; 60:17-18.

Boyle also admits he has no reason to think Corporal Sohl had an ulterior motive for ordering him to escort inmate Buchanan back to his cell, thus negating any inference that Sohl acted with a retaliatory or discriminatory motive.  Boyle Depo. Tr. 289:5-7.  And

finally, Boyle acknowledges that "repeated refusals to obey a superior officer's order are good cause for termination."  Boyle Depo. Tr. 222:8-11.

### C.    Miscellaneous employment "actions."

When asked in Interrogatory No. 6 to "[s]et forth fully all facts upon" which he bases his allegations of harassment, discrimination, and wrongful discharge, Boyle testified that all such facts are contained in his 15 page "timeline." Ex. 13 (Answers to Nos. 1 and 6); Ex. 12 (timeline); Boyle Depo. Tr. 22:19- 23:12.

Though most of the incidents are general complaints about trivial discomforts, assuming, *arguendo*, that some of them could constitute adverse employment actions, the incidents are discussed below:

1.    **June 2, 1998**.  Boyle learns through a "lay prison minister" that an inmate had information about a detective who had information regarding Boyle's visits to a "mental health doctor" and Boyle's blood pressure.  Ex. 14.

One day later, Boyle submits a disrespectful and sarcastic memorandum titled "Incompetence or harassment?" in which he complains that his supervisor, Defendant Dorsey, attacked him by writing a memo about Boyle's use of sick leave.  Ex. 15.

2.    **July 9, 1998.**  Boyle claims Defendant Dorsey prevented him from bringing his full sized Bible "past door 7" of the Harford County Detention Center. Ex. 12, p. 3; Ex. 16.  The directive has no effect on his ability to carry a smaller, "pocket" Bible.

3.    **March 21, 1999.**  Boyle is removed from the list of individuals who act as jail "exercise officer." This occurs after Boyle is caught shooting baskets in the exercise yard while an emergency door is left open in violation of jail policy.  Ex. 12, p. 7.  The

assignment of "exercise officer" does not involve any change in pay, benefits, job title, or rank.  Ex. 21.

      **4.**      **November 12, 1999.**  Boyle continues to request to be assigned as "exercise officer" but is turned down when the assignment is given to an officer with no prior disciplinary infractions involving the jail exercise yard (*see* above, Charge No. 3).  Aff. of Richard Aiello.

      **5.**      **August 17, 2000.**  While under investigation for refusing to obey Corp. Sohl's order, Boyle is made to work in the control room in plain clothes.  Boyle is already charged with breaching security and the jail administration has security concerns that Boyle may have a bias in favor of inmates over officers.  Ex. 12, p.12.  *See* Ex. 21, Aff. of Richard Aiello.  Boyle claims he is "totally embarrassed, humiliated" and that "[o]fficers [are] talking, whispering, and making fun of the situation."

      **6.**      **September 1, 2000.**  Again, Boyle complains he is not interviewed for the assignment of "exercise officer."  At this time, Boyle is facing charges of breaching security and insubordination which make him ineligible for consideration.  Ex. 12, p. 13; See also Ex. 19 (applicants must not be "currently ... under any disciplinary action.").  The assignment is given to Officer Stevens who Boyle does not list as an officer who is similarly situated to Boyle.  Boyle Depo. Tr. 223:14- 226:5.

III.    **ARGUMENT.**

A.    **Religious discrimination under Title VII and U.S.C. § 1983.**

1.    **Boyle has failed to allege facts to state a *prima facie* case of religious discrimination based on his religious practices, observances, or beliefs**

Boyle claim Defendant Dorsey "harassed" him simply because in July, 1998, Dorsey told him he could not to carry his full size Bible to his assignment post in the security area. Ex. 16.  Inexplicably, Boyle terms this "harassment" because he thinks Dorsey enlarged existing jail policy.  Exhibits 16, 21.  Rather, consistent with policy, which Boyle approved (Boyle Depo. Tr. 102:9-:13), Dorsey's directive allowed Boyle to (1) carry his pocket Bible at all times; (2) bring his full size Bible into the Detention Center; (3) store his full size Bible in his locker *or* in an approved location; (4) discuss Bible issues while on break and; (4) discuss Bible issues with inmates as a matter of conversation.  Ex. 20.[8]

_____

[8]    The full text of the policy memorandum reads as follows: "On today's date Warden O'Neill addressed the issue of reading material at post assignments as it pertains to bibles.  Upon discussion, it was reiterated that 'No reading material will be permitted at post assignments.'  However, employees will be permitted to:

1.    carry pocket bibles which they can read on break;

2.    bring full size bibles into HCDC [Harford County Detention Center], (they are not to be read while at post assignment);

3.    store full size bibles in the employee locker or in a location approved by the shift supervisor;

4.    discuss bible issues while on break or during meal time in the MP room; and

5.    discuss bible verses with inmates as a matter of conversation between inmate and employee, at which time

(continued...)

At his deposition, Boyle admitted that Dorsey allowed him to carry his "pocket" Bible at all times.  Boyle Depo. Tr. 76:18 - 77:5; 261:15 - 263:1.  He also admits Dorsey did not stop him from bringing his full size Bible into the Harford County Detention Center and storing it in his locker.  Boyle Depo. Tr. 165:19 - 167:10.  Nor does Boyle allege Dorsey prevented him discussing Bible issues while on break or during meal time *or* prevented him from discussing Bible verses with inmates as a matter of conversation.[9]

Boyle acknowledges that the size of his Bible is of no importance to his religious practices.  Nor is Boyle required to carry a Bible at all times. In fact, on the day he was deposed, he did not have a Bible.  Boyle Depo. Tr. 76:18 - 77:5; 293:18 - 294:10; 292: 14 -16.

A plaintiff may prove a disparate treatment claim by demonstrating "that the employer treated [him] differently than other employees because of [his] religious beliefs. *Chalmers v. Tulon Co.*, 101 F.3d at 1017 (emphasis in original).  However, absent direct evidence of discrimination, Boyle must rely on the burden shifting scheme articulated in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792 (1973).  To establish a claim under the *McDonnell*

---

[8](...continued)
bibles may be used as a reference in that context.

Supervisors are encouraged to comply with this memorandum.
Any subsequent questions should be addressed to my office."

[9] In truth, this incident was just one of many personality conflicts between Boyle and Dorsey. In fact, in effectively abandoning his discrimination claim, Boyle testified that he really had no idea why Dorsey allegedly "had it in for him.  Boyle Depo. Tr. Boyle Depo. Tr. 243:8 - 245:5.

*Douglas* scheme of proof, the plaintiff first must establish a *prima facie* case of discrimination.  Boyle "must project evidence sufficient to establish a *prima facie* case of intentionally discriminatory treatment" and if he does so, "the burden of production shifts" to the State defendants "to rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for its action."  If the defendants meet their burden of production, "the presumption of discrimination created by the *prima facie* case is rebutted and 'drops from the case,'" and plaintiff bears "the ultimate burden of projecting evidence sufficient to prove" that he has been "the victim[] of discriminatory treatment."  *Settle v. Baltimore County*, 34 F. Supp.2d 969, 990 (D. Md. 1999).

Here, Boyle must (1) show he was part of a protected group, (2) show that he was performing his job satisfactorily, and (3)provide "'indirect evidence whose cumulative probative force supports a reasonable inference that [the] [adverse employment action was discriminatory.'" *Id.* (quoting *Lawrence v. Mars, Inc.*, 955 F.2d 902, 905-06 (4th Cir.1992), *cert.denied*, 506 U.S. 823 (1992)).  The burden then shifts to the employer, who must show a legitimate, nondiscriminatory reason for taking the adverse action.  Upon such a showing, the burden shifts back to the Plaintiff, who must show that the employer's stated reason is merely a pretext for discrimination.  *Rushing v. Commonwealth of Virginia*, 1996 WL 673542 (E.D.Va.1996) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Having admitted that Dorsey's directive had no affect on his religious beliefs, observances, or practices, Boyle concedes he has no evidence of religious discrimination.  At best, Boyle alleges that Dorsey restricted a religious *preference* not protected by Title VII

14

or the United States Constitution. *Tiano v. Dillard Dep't Stores, Inc*. 139 F.3d 679, 682 (9th Cir.1998)(Title VII does not protect secular preferences.").

In terms of indirect evidence, Boyle can barely satisfy the first requirement, that he is a member of a protected group.[10]   At any rate, he cannot make out the second and third prongs of the indirect proof scheme. His disciplinary record demonstrates he was not performing his job satisfactorily.  He offers virtually no indirect evidence "whose cumulative probative force supports a reasonable inference that [the] [adverse employment action was discriminatory." *Lawrence v. Mars, Inc*., 955 F.2d at 905-06.

When asked to present evidence of discrimination, Boyle simply concluded that he "believe[ed] that the administration at that time did not want somebody ... going around professing Bible principles, treating inmates with respect like that."  His personal opinion is of no moment. When asked for evidence to support his opinion, he refers to his termination and the fact that he was transferred twice in a two year period.  Boyle Depo. Tr. 190:11-21; 195:8 -16; 202:6 -13.   However, Boyle admits the reasons for both transfers were non-discriminatory. He testified the first transfer was the result of the ongoing personality conflict between him and Dorsey and the second transfer was the result of potentially slanderous remarks he made about Corporal Sohl.  Boyle Depo. Tr. 197:2 - 202:5 (calling Sohl "dirty" and "guilty" of sexual misconduct).

---

[10] Boyle's testimony here is confusing.  He claims he does *not* practice a religion but rather has a "relationship with the Lord." Boyle Depo. Tr. 17:17-18.  His religious practices are limited to "praying constantly, reading the Bible every day, [and] watch[ing] a lot of religious programs on T.V..." Boyle Depo. Tr. 16:20- 17:3. His only religious requirements are that he "obey the word of God" and "spread the word of God to witness." Boyle Depo. Tr. 18:14-18; 20:10-13.

Equally fatal to Boyle's claim is the fact he cannot show he was replaced by someone with comparable qualifications outside the protected class. *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998); *Autry v. North Carolina Dept. of Human Resources*, 820 F.2d 1384, 1385 (4th Cir. 1987).  Nor can he show that the officers who allegedly "harassed" him were of different religions or faiths or that similarly situated officers were treated more favorably. Inasmuch as Boyle has named officers who committed similar offenses but were not terminated, those officers had no prior disciplinary records and hence, are not comparable. Ex. 21.[11]

Also, Boyle's claim that he was treated more harshly because of his religion is inconsistent with his own evidence.  Boyle states his "strong religious beliefs and activities" were well known to the personnel at the Detention Center during his *entire thirteen year career* at the Detention Center, that he was "given a Certificate of Appreciation by the Harford County Law Department in 1995," and "proudly named Officer of the Year in 1996, with substantial publicity." Am.Comp. at ¶¶ 1, 13.  Yet, he cannot explain why, after eleven

---

[11]  Boyle also complains he was denied the assignment of "exercise officer."  This is not an adverse employment action.  *Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001).  Even so, Boyle cannot deny that his prior disciplinary record precluded him from being equally qualified for the position.  See Affidavits of State defendants and Thomas Golding, Exhibits 21-27.  *See also Woodfield v. Heckler*, 591 F. Supp. 1390, 1398 (E.D. Pa. 1984) (by requiring plaintiff to perform at level required for his position, employer articulated legitimate nondiscriminatory reason for its demotion of plaintiff and plaintiff could not recover for alleged age discrimination).

years of conspicuous religious activity, he is suddenly the victim of religious intolerance even though Sheriff Meadows has been his employer since 1994.[12]

> ### 2. Boyle cannot show that the State defendants' reason for taking adverse actions against him is pretextual.

At any rate, Boyle cannot refute the Defendants' nondiscriminatory reason for his suspension and termination.[13]  As discussed above, Boyle does not dispute the material facts that led to the adverse employment actions taken against him. In the first incident, he pled guilty to one of the charges. Boyle Depo. Tr. 86:1 -9.  In the second incident which resulted in his termination, he admits he repeatedly refused to follow Corporal Sohl's order.  Boyle Depo. Tr. 57:18-20; 61:1 -3 (failed to follow Corp. Sohl's order); 61:1 -6 (failed to follow Sgt. Wells' order).  He also does not deny that he argued with Corporal Sohl by falsely claiming he did not have keys.  Boyle Depo. Tr. 59:3 -12; 289:8-20; 60:5-13; 60:17-18. These reasons, which Boyle cannot say are unfounded, are more than sufficient non-discriminatory reasons for every adverse action taken against Boyle during his tenure.  Thus, his discrimination and retaliation claims pursuant to Title VII, 42 U.S.C. § 1983, and State law must fail.[14]  *Hughley v. Maryland-National Capital Park & Planning Comm'n*, 668 F.

---

[12] Nor can Boyle state with any certainty that his religious beliefs are unlike those of the defendants. Boyle Depo. Tr. 237:18 -21; 238:13 - 240:11.

[13] *See* Affidavits of State defendants and Thomas Golding, Exhibits 21-27.

[14] The burdens of proof for Title VII are the same for claims under 42 U.S.C. § 1983. *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1285 (1985) ("under Title VII and either 1981 or 1983, the elements of the required *prima facie* case are the same").

Supp. 469, 475 (D. Md. 1987), *aff'd*, 873 F.2d 1439 (1989) (discharge of park police officer candidate for refusal to complete patrol training which was mandatory for all probationary employees, was nondiscriminatory reason under 42 U.S.C. § 2000e (b)); *Grooms v. Wiregrass Electric Cooperative*, 877 F. Supp. 602, 608-09 (M.D. Ala. 1995) (laborer failed to state a claim for relief against employer under 42 U.S.C. § 1981 because plaintiff failed to demonstrate that the defendant's reasons for terminating his employment were pretextual or that termination was based on discriminatory intent).[15]

**B.      Just as Boyle fails to state a *prima facie* case for religious discrimination, he cannot state a *prima facie* case for retaliation.**

As stated above, Boyle's employer has presented a legitimate, non-discriminatory reason for all adverse actions taken against him.  Even so, Boyle fails to state a *prima facie* case of retaliation insofar as he has not shown he engaged in a protected activity such as filing an EEO complaint.  *Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir.2001).  Nor has he shown a "causal connection between the protected activity and the asserted adverse action."  *Id.*

---

[15] Courts have also recognized that employees may utilize two theories in asserting religious discrimination claims: "disparate treatment" and "failure to accommodate." *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1017 (4th Cir.1996).  However, as stated above, Boyle does not contend that any action by the State defendants conflicted with a bona fide religious belief or that he was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon,* 101 F.3d at 1019 (*quoting Turpen v. Missouri-Kansas-Texas R.R. Co.*, 737 F.2d 1011, 1026 (5th Cir.1984)), *aff'd on other grounds*, 479 U.S. 60, 65 (1986).  Therefore, a failure to accommodate claim would not be cognizable.

### 1.    Boyle did not engage in protected activity

Out of approximately 20 paragraphs which list in specific detail accusations of wrongdoing, Boyle never claims he participated in an EEOC investigation or opposed activity prohibited by Title VII.  The only possible reference made in the Complaint is a single, vague statement in paragraph 12d in which Plaintiff states he "wrote to defendant Aiello three times about the harassment he received at the hands of defendant Dorsey [and others]... which resulted in defendants Aiello, Dorsey, DeHaven and another officer surrounding the plaintiff in a physically threatening manner, and harassing him in a meeting."

"[A] plaintiff must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery."  *Karpe v. Inova Health System Servs.*, 134 F.3d 1222, 1227 (4th Cir.1998), *quoting Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir.1990.  Here, vague references to letters complaining about harassment do not give the State defendants any notice that Plaintiff engaged in protected activity.  Moreover, Boyle had an opportunity to file an amended pleading which is just as lacking as the original Complaint.  Instead of references to engaging in activity protected by Title VII, Boyle's pleading is dominated with charges he was retaliated against ... "based on [his] complaints of corruption and cover-up at the Harford County Detention Center."  Federal courts do not recognize this activity as protected under Title VII.  *Jamil v. Secretary, Department of Defense*, 910 F.2d 1203, 1207 (1990) ("Title VII is not a general "bad acts" statute; it only addresses discrimination on the basis of race, sex, religion, and national origin, not

discrimination for whistle blowing").[16]   On this basis alone, Boyle's retaliation claim must be dismissed.

To the extent this Court liberally reads Boyle's Complaint to include Boyle's apparent belief that his July 9, 1998, memo is protected activity, Boyle's memo is merely a complaint about a religious preference.  Ex. 16; *see also Tiano v. Dillard Dep't Stores, Inc.* 139 F.3d at 682 (religious preferences not protected).  He is neither opposing a practice prohibited by Title VII nor is he participating in a "Title VII" proceeding.  Ex. 16.  *See also Glover v. South Carolina Law Enforcement Division*, 170 F.3d 411, 413 (4th Cir.1999) (Plaintiff must either oppose practice made unlawful by Title VII or make a charge, testify, assist, or participate in a Title VII investigation, proceeding, or hearing).  Therefore, his retaliation has no merit

### 2.   Boyle cannot show any causal connection between his "Religious Harassment" memorandum and any adverse employment action.

Even if Boyle's memo is protected activity, it cannot be the basis for a retaliation claim because any "retaliation" did not occur until two years later.  The Fourth Circuit has concluded in other cases that "a lengthy time lapse between the employer being aware of the claimant's protected activity and the alleged adverse action negates any inference that a causal connection existed." *Lewis v. Caldera*, 2001 WL 460753, * 16, *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998).

This Court recently concluded in *Vandevander v. St. Mary's County Sheriff's Office*, 2001 WL 5899989 (2001) that a five-month lapse between the Sheriff's knowledge of the

---

[16] *Jamil* also disposes of Count II in Boyle's complaint in which he incorrectly claims that Title VII protects "whistle blowing" activities.

plaintiff's protected activity and his decision to terminate the plaintiff's employment was too long to support of a finding of retaliation. *Id.* at *8. *See also Conner v. Schnuck Markets, Inc.* 121 F.3d 1390, 1395 (10th Cir.1997)(noting that four-month lag is not enough to justify an inference of causation). Here, the lapse in time between the memo and Boyle's suspension and/or termination is more than five times the time difference in *Vandevander,* thus negating any inference of a causal connection.[17]

### C.   Boyle has stated an insufficient claim of hostile work environment.

Boyle also alleges that he was subjected to a pervasively hostile work environment because of his religious beliefs and activities. A *prima facie* case for religiously hostile work environment under Title VII is made out where the harassment: 1) was unwelcomed; 2) was based on religion; 3) was severe and pervasive to alter the condition of employment and create an abusive atmosphere; and 4) there is some basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d at 801. *Accord Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

---

[17] The large time lag also disposes of any possible claim Boyle may try to assert regarding his so-called "whistle-blowing" activities. Boyle claims that in January, 2000, he offered to help an inmate complain that Defendant Sohl had "touch[ed] her on the arm" and made "innuendoes." Ex. 13 at p. 9 (entry "1/00"). Boyle's activities occurred a full seven months before he was charged with insubordination in August, 2000. Ex. 21. Also, Boyle's passive participation in the case is not protected activity. *See Sawicki v. American Plastic Toys, Inc.,* 180 F.Supp.2d 910, 916-17 (E.D.Mich.2001) (mere delivery of subordinate's complaint against male co-worker to management not protected activity); *Swanson v. General Serv. Admin*, 110 F.3d 1180, 1188 n.3 (5th Cir.1997) (mere fact that adverse action is taken after an employee engages in some protected activity not, in itself, sufficient to state a *prima facie* case of retaliation).

While the alleged harassment was unwelcomed, Boyle has failed to satisfy the remaining elements.  He must allege specific statements, events or incidents of harassment based upon his religion.  His conclusory beliefs are insufficient  Here, Boyle's only allegations of religious harassment, apart from Defendant Dorsey's "Bible" directive relating to a religious "preference," are allegations including in his EEOC charge alleging that unknown persons referred to him as "bible toter" or "bible man." The Supreme Court has said that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Thus, these comments and a single directive regarding his carrying of a large Bible are insufficient to show a hostile work environment that is pervasive and regular.  *See Faragher* v. City of Boca Raton, 524 U.S. 775, 788 (1998) (isolated incident will not amount to changes in terms and conditions of employment).  *See also Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986) (to establish hostile atmosphere, plaintiffs must prove more than a few isolated incidents of racial enmity); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981) (no violation of Title VII from infrequent use of racial slurs).  Boyle cannot show that "the workplace was permeated with discriminatory intimidation, ridicule, and insult."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Moreover, any objection to Boyle teaching and proselytizing to the inmates would be a legitimate concern over fraternization of correctional officer with prison inmates.  *See Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1998) (fraternization with inmates is legitimate nondiscriminatory reason).

Boyle also has no evidence to show employer liability.  If Boyle alleges harassment committed by a co-worker, he must show the employer knew or should have known of the harassment and failed to take prompt remedial action.  *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir. 1999); *Jaudon v. Elder Health, Inc.*, 125 F. Supp.2d 153-160-61 (D. Md. 2000).  Boyle does not claim he reported any alleged religious based derogatory statements to anyone.  As for his single allegation that Defendant Dorsey harassed him because of his religious "preference," there is no evidence of any disciplinary action taken whatsoever. Boyle has simply not alleged the type of open and pervasive religious harassment that would have put his employer on notice.  *Kunin v. Sears & Roebuck*, 175 F.3d 289, 294 (3rd Cir.), *cert. denied*, 528 U.S. 964 (1999).

An employer may also be liable when a supervisor is "aided in accomplishing their tortious objective by the existence of the agency relation."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998).  If the supervisor is so aided, "[a]n employer is subject to vicarious liability to a victimized employee for actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 803; *Burlington Industries, Inc.* 524 U.S. at 765.

Again, apart from his complaint that Dorsey limited his religious preferences, Boyle does not allege that any supervisor made comments or harassed him based upon his religion. His conclusory comments that "supervisory personnel at the Harford County Detention Center violated those principles or applied them in a discriminatory manner" (Complaint ¶ 36) is pure conjecture.  Accordingly, Boyle's hostile work environment claims must be dismissed.

**D.     Qualified Immunity.**

Insofar as Boyle may allege he was terminated for any other reason than his religion, retaliation for filing a complaint of religious discrimination, or retaliation for filing a complaint of employee misconduct, the State defendants would still be entitled to qualified immunity for claims under 42 U.S.C. § 1983.  A public official performing discretionary duties enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  It is clear that the immunity afforded is "immunity from suit" and an entitlement not to stand trial or face the other burdens of litigation "rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Once a defendant has pleaded qualified immunity from suit, the courts should, at the pleading stage, clearly determine whether the plaintiff had an existing constitutional right at the time the defendant acted. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994) *citing Siegert v. Gilley,* 500 U.S. 226, 233 (1991).  And, once the defendant pleads qualified immunity, the majority of circuits, including the Fourth Circuit, hold that the burden then shifts to the plaintiff to show that the right allegedly violated was clearly established at the time of the challenged conduct. *See, e.g., Magdziak v. Byrd,* 96 F.3d 1045, 1047 (7th Cir. 1996); *White v. Chambliss,* 112 F.3d 731, 737 (4th Cir. 1997); *Wilson v. Layne,* 526 U.S.603, 119 S.Ct.1692, 1696 (1999).

Firing Boyle for disobeying orders does not violate any clearly established constitutional right. Boyle was a member of paramilitary organization that followed a

specific authoritarian protocol which required him to follow orders from superior officers. Insofar as Boyle may allege this violated a constitutional right, that right was not clearly established at the time Boyle's employment was terminated.

**E.    For the same reasons stated above, Boyle's various State and county law claims must fail.**

**1.    Boyle cannot maintain his claim for wrongful discharge based on any cognizable theory.**

In Counts II, III, IV md VIII of the Complaint, Boyle alleges that he was wrongfully discharged for various reasons. However, it is clear that the tort of wrongful discharge will not lie where there is a statutory remedy for alleged violations. *Chappell v. So. Md. Hospital Inc.*, 320 Md. 483, 578 A.2d 766 (1990) (opining where laws on which allegedly violated public policy are predicated provide a statutory remedy, the tort of wrongful discharge does not apply); *Makovi v. Sherwin-Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989); *Childers v. Chesapeake and Potomac Telephone Co.* 881 F.2d 1259, 1266 (4th Cir. 1989); *Parlato v. Abbott Laboratories* 850 F.2d 203 (4th Cir. 1988), *aff'd* 886 F.2d 1429 (4th Cir. 1989).

Boyle himself provides the references to the statutory remedies available to him Article 49B of the Annotated Code of Maryland; Title Vll of the Civil Rights Act of 1964 and 42 U.S.C. Section 1983 (Complaint, 27). Therefore, inasmuch as he can seek redress under other statutory schemes, the wrongful discharge claims cannot lie and, therefore, should be dismissed.

Furthermore, in Count VIII of the Complaint, Boyle alleges wrongful discharge predicated upon a violation of the Law Enforcement Officers' Bill of Rights, COMAR and the Harford County Detention Center Policy and Procedures. To assert a claim for wrongful

25

discharge, Boyle must allege: "(1) discharge; (2) in retaliation for refusing to violate some clear mandate of public policy that is reflected in a statute but is not vindicated by that statute or elsewhere; and (3) a causal connection  between the public policy violation and the decision to discharge."  *Magee v. Dansources Technical Services, Inc.*, 137 Md.App. 527, 566 (2001).

In exceptionally confusing fashion, Boyle cites to Article 27, Section 727 through 734 of the Annotated Code of Maryland (known as the "Law Enforcement Officers' Bill of Rights" (LEOBR)).[18]   However, LEOBR is only applicable to law enforcement officers; someone who is authorized by law to make arrests. Md. Ann. Code art. 27, Section 127(b). Correctional officers such as Boyle are not sworn law enforcement officers and have no legal authority to make arrests. As such, Boyle has failed to set forth a clear mandate of public policy that has been violated, and, therefore, Count VIII should be dismissed.

Even if Boyle was covered by the LEOBR, his claim for wrongful discharge must fail as the LEOBR provides statutory remedies under Sections 732 and 734 for alleged substantive or procedural violations of the administrative rules. Specifically, at any time during the process, Section 734 permits an officer to seek a show cause order with the circuit court if it is believed that his rights have been violated. Section 734 permits Boyle to seek judicial review from the circuit court if he was dissatisfied with the  decision of the agency. Boyle failed to take advantage of any of these remedies.

----

[18]Boyle makes  a general reference to C0MAR but provides no further information. Defendants assume that Boyle  is referring to sections regarding the LEOBR, which are inapplicable to him.

In terms of the substantive merits of Boyle's wrongful discharge claim, Boyle must assert "more than a mere allegation that [defendants] discharged him because he was executing his duty." *Bagwell v. Peninsula Regional Medical Center*, 106 Md.App.470, 498 (1995).   Though he baldly alleges he was fired because of his religion and because he reported wrongful activity, he cannot overcome the fact that he was fired because he refused to obey a superior officer's order.   Even if Boyle denied committing the actions that led to his discharge, and he does not, it is not enough for Boyle to simply claim that the allegations leading up to his discharge were unsubstantiated or without sufficient proof.   As the Court of Special Appeals stated in *Beery v. Md. Medical Laboratory, Inc.*, 89 Md.App.81 (1991), the employer must only show that the reason Boyle was discharged was not a wrongful one:

> Had [the employee] been guilty of the alleged misconduct, it would have been entirely proper and appropriate for the employer to fire [him].   Firing [him] on the basis of ... unsubstantiated allegations, without proof and, indeed, without fully investigating the matter, may very well have been improper – even foolish – but can hardly be said to contravene any clear mandate of public policy.

*Id.* at 94-95.   Boyle admits he committed at least some of the actions which led to his two trials. For that reason alone, his wrongful discharge claim must be rejected.

### 2.     Boyle cannot bring a separate cause of action under Chapter 95 of the Harford County Code.

In Count I of the Complaint, Boyle alleges a violation of Section 95-5 of the Harford County Code claiming the Defendants harassed and terminated him because he "disclosed and expressed opposition to illegal and improper conduct by supervisory personnel." (Complaint at ¶ 18).   Section 95-5D, the section partially quoted by Boyle, reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment

27

agency to discriminate against any person or for a labor organization to discriminate against any member thereof or applicant or membership because he has opposed any practice made an unlawful employment practice by this section or because he has made a charge or testified, assisted or participated in any manner in any investigation, proceeding or hearing under this section.

Boyle attempts to present a separate cause of action pursuant to Section 95-13 of the Harford County Code which states that an individual who is "aggrieved by an act prohibited herein may bring an appropriate action in law or in equity in the Circuit Court for the county to seek damages, including counsel fees, redress of injury or injunctive relief arising out of any act prohibited herein, in addition to pursuing the procedures and seeking the remedies established herein."  However, the Maryland Court of Appeals held only last December that this law is unconstitutional and cannot confer jurisdiction to the Circuit Court.  In *H.P. White Laboratory, Inc. v. Blackburn*, 373 Md. 160 (2002), a former employee of the company brought suit against his former employer under Chapter 95 of the Harford County Code to recovery monetary damages and attorney's fees.  The Court of Appeals, presented with a challenge to the statute, discussed the authority of a home rule county such as Harford County to enact local laws:

> "Article XI-A, §3 of the Maryland Constitution, *inter alia*, grants to the county council of a charter county 'full power to enact local laws of said…County…upon all matters covered by the express powers granted' to charter counties.  If, however, an ordinance enacted by a charter county does not constitute a 'local law' within the meaning of Article XI-A, it is beyond the authority of a charter county and, therefore, is unconstitutional.  *See McCrory Corp. v. Folwer*, 319 Md. 12, 17-24, 570 A.2d 834, 836-640 (1990) and cases there cited."

*H.P. White Laboratory, Inc. v. Blackburn*, 373 Md. at 168 (quoting *Montgomery County v. Broadcast Equities*, 360 Md. 438, 441 n. 1, 758 A.2d 995, 996 n. 1 (2000).

The Court of Appeals in *Blackburn* held that the Harford County statute was virtually identical to the statute in question in *Broadcast Equities*, where the Montgomery County statute was not a "local law" and therefore was unconstitutional:

> "In creating a new judicial cause of action between private individuals, §27-20(a) encroaches upon an area which heretofore had been the province of state agencies.  In Maryland, the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State. *See e.g. Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) (recognizing tort actions for abuse discharge). Furthermore, the creation of new judicial remedies has traditionally been done on a statewide basis."
>
> ...
>
> It is true that the field [of abuse employment practices] has not been preempted by the State, and the home rule counties have concurrent authority to provide administrative remedies not in conflict with state law.  Nevertheless, creating a remedy which has traditionally been the sole province of the General Assembly and the Court of Appeals, to combat a statewide problem such as employment discrimination, goes beyond a 'matter [] of purely local concern." *State v. Stewart*, *supra*, 152 Md. at 422, 137A. at 41…[Section] 27-20(a) of the Montgomery county Code affects 'matters of significant interest to the entire state' and cannot qualify as a 'local law' under Article XI-A."

*H.P. White Laboratory, Inc. v. Blackburn,* 812 A.2d at 310 (quoting *McCrory Corp. v. Fowler,* 319 Md. 12, 19-21, 570 A.2d 834, 837-38 (1990)).  Because the Court of Appeals in *Blackburn* found that §95-13 of the Harford County Code was virtually identical to the statute in Howard County (struck down in *Sweeney v. Hartz Mountain Corp*, 319 Md. 440 (1990)), and the Montgomery County statute (struck down in *McCrory* ), the Harford County statute did not constitute a local law and is unconstitutional.  Therefore, Boyle cannot maintain a separate cause of action under Chapter 95 of the Harford County Code.

Even if Boyle could bring a separate action under Chapter 95, Boyle has failed to allege he opposed an "unlawful employment practice" identified in Section 95-5 or

participated in any investigation, proceeding or hearing under that section.[19]  Nor can Boyle

demonstrate a sufficient nexus between his so-called opposition and his suspension and

termination.   As stated above, Boyle's complaints about "religious harassment" are

complaints about restrictions on his religious preferences. The remainder of his complaints

are about alleged wrongdoings of other employees.   His allegations do not constitute

unlawful employment practices as defined in Section 95-3, and, as discussed above, Boyle

cannot show a sufficient nexus between his complaints and any adverse employment actions

taken against him.

> **F.   Many of Boyle's Claims are barred by limitations and/or failure to exhaust administrative remedies.**
>
> > **1.   State tort and § 1983 claims against Defendants Walter, Aiello, DeHaven, Dorsey, and Sohl.**

Boyle's claim that he was "harassed" by Defendant Dorsey's July 9, 1998, memo is

barred by the statute of limitations insofar as he brings a State tort or § 1983 action.

Likewise, Boyle has no similar causes of action with regards to any of the incidents alleged

in his complaint that occurred prior to September 24, 1998 since Boyle did not file suit until

September 24, 2001. Section 5-101 of the Courts and Judicial Proceedings Article, Md. Code

Ann., provides that "[a] civil action at law shall be filed within three years from the date it

accrues unless another provision of the Code provides a different period of time within which

---

[19]Section 95-5 makes it an unlawful employment practice for an employer, employment agency or labor organization to discriminate, as defined by Section 95-3, based upon race, creed, color, sex, origin, age, occupation, martial status, political opinion, personal appearance or physical or mental handicap.

an action shall be commenced."  For actions arising under 42 U.S.C. §§1981, 1983, 1985 in Maryland, the three-year limitations period is appropriate. *Linder v. Litton Sys.,* 81 F.R.D. 14 (D.Md.1978) (Three-year period applies to §1981 actions). *See also McIver v. Russell*, 264 F.Supp. 22 (D. Md. 1967) (For actions arising under §1983), *Lewis v. Clark*, 534 F.Supp. 714 (D.Md. 1982) (For actions arising under §1985 alleging violations of due process), and *Parish v. Maryland & Va. Milk Producers Ass'n*, 437 F.Supp. 623 (D. Md. 1977) (Three-year limitation applies to actions brought pursuant to §1985).  Accordingly, since there is no other provision governing wrongful discharge, the three-year limitation applies as well. Therefore, with respect to any incident occurring prior to September 24, 1998, Boyle's State tort and § 1983 claims are barred.

> ### 2.    Title VII claims.

Though the majority of Boyle's gripes and accusations of harassment do not constitute adverse employment actions, claims regarding all but three of his alleged incidents are also barred because Boyle did not exhaust his administrative remedies.  In order to bring these claims under Title VII, Boyle would have had to file his EEOC charge within 300 days of the incident. *Tinsley v. First Union Nat. Bank,* 155 F.3d 435, 439 (4th Cir.1998).   In Maryland, a deferral state, a Title VII charge of discrimination must be filed with the EEOC within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1). "Timeliness requirement for an action alleging employment discrimination are to be strictly enforced."  *Tangires v. Johns Hopkins Hosp.*, 79 F.Supp.2d 587, 597 (D.Md.), *aff'd*, 230 F.3d 1354 (4th Cir.2000).

31

The only incidents that occurred within 300 days of Boyle's EEOC charge, which was filed on June 6, 2001 (Ex. 8), are Boyle's suspension, termination, and the final denial of the "exercise officer" assignment. All other claims are procedurally barred.

### 3.   Boyle can bring no federal claim against Sheriff Meadows and his State claims arelimited to incidents occurring after December 13, 1999.

In order to maintain an action against Sheriff Meadows for violations prohibited by Title VII, Boyle must have filed suit against the Sheriff within 90 days of receiving his "right to sue" letter, which was issued on June 27, 2001. Ex. 9.  Boyle did not file suit against the Sheriff until December 13, 2002, more than eighteen months after receiving his "right to sue" letter.  Therefore, all Title VII claims against Sheriff Meadows must be dismissed. *Griffin v. Prince William Hospital Corporation*, 716 F.Supp. 919, 921 (E.D.Va.1989).

Likewise, Boyle's claims brought pursuant to §1983 are also barred.  In *Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir.1995), *cert.denied*, 516 U.S. 870 (1995), the Fourth Circuit held that a plaintiff who did not bring a Title VII claim within the time period permitted by Title VII could not bring a § 1983 action for violation of her rights under the Fourteenth Amendment.   *Id.* at 1383; *see also Burtnick v. McLean*, 953 F.Supp. 121,123 (D.Md.1997)(entering summary judgment on all § 1983 claims alleging sex and race discrimination).  Therefore, because Boyle had the opportunity but neglected to file suit against Sheriff Meadows after receiving his "right to sue" letter, he cannot neither assert a companion § 1983 claim.

32

In terms of any State law claim, Boyle is also precluded from bringing any claim against Sheriff Meadows for any incident that occurred prior to December 13, 1999 since Maryland's three-year statute of limitations would bar those actions.

>    **4.      All of Boyle's Title VII claims against the State defendants, in their individual capacities, must be dismissed because he has failed to exhaust his administrative remedies.**

As a rule, a civil action for discrimination may only be brought against the party named in the original administrative charges filed with the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1)  (an action may be brought against the respondent named in the charge). *Accord Alvarado v. Bd. of Trustees*, 848 F.2d 457, 458 (4th 1988); *Johnson v. State of Maryland*, 940 F. Supp. 873, 876 (D. Md. 1996).   This requirement serves two important purposes.  First, it notifies the charged party of the asserted violation.  Second, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law. *Dickey v. Greene*, 710 F.2d 1003, 1005 (4th Cir. 1983). Failure to name or otherwise identify a party in the charge is proper ground for dismissal of the claim against the unnamed defendant. *Id.    But see McAdoo v. Toll*, 591 F. Supp. 1399, 1403-04 (D. Md. 1984); *Vanguard Justice Society, Inc. v. Hughes*, 471 F. Supp. 670, 688-89 (D. Md. 1979).

In his Charges of Discrimination, Boyle named only the "Harford County Sheriff's Department," "Harford County Government," and the "State of Maryland" as the agencies that discriminated against him.  Ex. 8.  Boyle named no individuals by name, rank, or title. Thus, the Title VII claims must be dismissed with respect to all individual defendants (Meadows, Walter, Aiello, DeHaven, Dorsey, and Sohl). *See, e.g., Dickey v. Greene*, 710

F.2d at 1006 (motion to dismiss proper where plaintiff sued parties that had not been named in her EEOC charge, also, court noted that plaintiff failed to list defendant in additional space for employer who may have discriminated against her).

In *Casey v. Balog*, 162 F.3d 795 (4th Cir.1998), the plaintiff named only the City of Baltimore in two EEOC charges and, after receiving a right to sue letter, commenced a civil action in federal court, naming several Baltimore City employees in their individual capacities. *Id.*., at 800-01. The Fourth Circuit held that the individual defendants could not be held personally liable under Title VII, due to the plaintiff's failure to name them in his administrative charge. *Id.*; *see also Norville v. Anne Arundel County Board of Education*, 1999 WL 1267696 at *2 (D.Md). The only exception to this rule is found in *McAdoo v. Toll*, 591 F.Supp.1399 (D.Md.1984), where the plaintiff named only the University of Maryland in her EEOC charge but permitted her to sue University of Maryland employees in their *official capacities* since the University of Maryland was the defendants' employer and the employees had interests "substantially identical" to the named party.   *Id.* at 1401-03. Therefore, it is without dispute that Boyle is barred from suing the State defendants in their individual capacities.  Moreover, he is barred from suing the State defendants in their official capacities insofar as they are deemed to be employed by either the State of Maryland or the Harford County Sheriff's Department. As this Court previously determined on December 6, 2002, Harford County, and not the State of Maryland, is the State defendants' (and Boyle's) employer for purposes of Title VII.  Similarly, the Harford County *Sheriff's Department* is not a proper party because is not an entity capable of suit.  In *Revene v. Charles County Commissioners*, 882 F. 2d 870, 874 (4th Cir. 1989), the Fourth Circuit held that the plaintiff's

34

complaint was properly dismissed because the "Office of the Sheriff" was not a cognizable legal entity separate from the Sheriff in his official capacity and therefore, the "Office of the Sheriff" could not be a defendant in a Section 1983 action.  *See also Boyer v. State,* 323 Md. 558, 572, n. 9 (1991)("Neither the Constitution nor any other provision of law of which we are aware creates a government agency known as the "Sheriff's Department."); *Post v. City of Fort Lauderdale,* 750 F.Supp. 1131 (S.D. Fla. 1990)(Ft. Lauderdale Police Department is not an entity subject to suit.); *Eddy v. City of Miami,* 715 F.Supp. 1553 (S.D. Fla. 1989)(Same--Miami Police Department); *Shelby v. City of Atlanta,* 578 F.Supp. 1368 (N.D. Ga. 1984)(Same--Atlanta Police Department); *Martinez v. Winner,* 771 F.2d 424 (10th Cir. 1985)(Same--Denver Police Department); *Ngiraingas v. Sanchez,* 858 F.2d 1368 (9th Cir. 1988)(Same--Guam Police Department); and *Raqusa v. Streator Police Department,* 930 F.Supp. 814 (D.Ill. 1981)(Same--Streator (Ill.) Police Department).  *See, also, Ashburn v. Anne Arundel County,* 306 Md. 617 (1986), *aff'd on other grnds*, (Anne Arundel County Police Department is not a legal entity subject to suit).

**G.      Claims barred by immunity.**

**1.      Plaintiff's State law claims and claims based on county ordinances are barred by the Eleventh Amendment.**

As to all of Boyle's non-federal law claims, they are barred by the Eleventh Amendment of the United States Constitution. *Pennhurst State School & Hospital v. Halderman* 465 U.S. 89, 121 (1984).  It is well established that federal courts are prevented from deciding whether state officials have violated State law. *Pennhurst*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether

35

prospective or retrospective, does not vindicate the supreme authority of federal law").  As will be explained below, all the individual defendants, with one exception, are state officials.

      **2.**      **Defendants Meadows, Aiello, DeHaven, Dorsey, and Sohl, in their official capacities, are Immune For Boyle's Claims in Counts I, III, IV, V, VI, and VIII.**

Additionally, except for claims brought under Title VII, Boyle's official capacity claims against Meadows, Aielle, DeHavor, Dorsey, and Sohl are barred by the Eleventh Amendment.  The Eleventh Amendment protects both "arms of the State" and state officials. *Cash v. Granville County Board of Education*, 242 F.3d 219, 222 (4th Cir. 2001).  "When the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464 (1945).  "Consequently, if the State treasury will be called upon to pay a judgment," then "Eleventh Amendment immunity applies," and "consideration of any other factor becomes unnecessary."  *Cash v. Granville County Board of Education*, 242 F.3d at 223 (citations omitted).

As a matter of Maryland law, the Sheriff is an official and employee of the State.  Md. Const. Art. IV, § 44.  *See Rucker v. Harford County*, 316 Md. 275, 281 (1989).  *See also Dotson v. Chester*, 937 F. 2d 920, 927 (4th Cir. 1991)(quoting *Rucker v. Harford County*, 316 Md. at 287)(control of sheriff's functions by common law, the General Assembly and by the judiciary coupled with the statewide nature of many of the sheriff's duties strongly reinforce the view that sheriffs are State officials); Prince George's County v. Aluisi, 354 Md. 422, 434 (1999) ("Sheriffs and deputy sheriffs are state officials, not local government

36

officials..").  A Sheriff and deputy sheriff also qualify as "State personnel" for purposes of

the Maryland Tort Claims Act, *see* Md. Code Ann. State Gov't §§12-101, and is protected

by the State's sovereign immunity from tort actions, pursuant to Md. Code Ann. Cts. and Jud.

Proc. §§ 5-511 and 5-522(b).

Recently passed legislation further confirms the State's financial responsibility for

defense and indemnification of judgments against sheriffs.  *See* Md. Code Ann., State Govt.

§ 12-405; Senate Bill 489, 2001 Regular Session.  While the counties are generally

responsible for expenses of the sheriff's office, *e.g.,* salaries and expenses, *see* Md. Cts &

Jud. Proc. § 2-309, the State is responsible for personnel and other administrative activities.

Because an employment discrimination claim is not a salary or expense, but a personnel

activity, the State would be responsible for any judgment against the Sheriff and his deputies

in this case.  Therefore, the Eleventh Amendment applies.

### 3.  Plaintiff's § 1983 claims are barred against Defendants Meadows, Aiello, DeHaven, Dorsey, and Sohl in their official capacities.

A suit against a State employee in his official capacity is tantamount to a suit against

the State of Maryland. *Hafter v. Melo,* 502 U.S. 21, 24 (1991), *quoting Kentucky v. Graham,*

473 U.S. 159, 166 (1985); *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987) (suit against

an individual in his official capacity "is tantamount to an action directly against the public

entity of which the public official is an agent.").  Therefore, it is without serious dispute that

the defendant Sheriff and deputy sheriffs, in their official capacites, cannot be sued in federal

court under §1983.  In *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, (1989), the

Supreme Court concluded that only a "person" can be sued under §1983-- ". . . neither a state

nor its officials acting in an official capacity are 'persons' under section 1983".[20]  Since the

State of Maryland is not a "person" under §1983, no suit can be maintained under §1983. *See*

*also, Ritchie v. Donnelly,* 597 A.2d 432, 437, 324 Md. 344, 355 (1991).

It is also well-settled that the Eleventh Amendment to the U.S. Constitution prohibits

suits in federal court by a citizen against a state, *Edelman v. Jordan,* 415 U.S. 651, 663-68

(1974),  *see also Will v. Michigan Dept. of State Police, supra.,* unless the State has waived

its immunity or Congress has overridden the immunity.  *Pennhurst State School and Hospital*

*v. Halderman,* 465 U.S. 89, 98-100. Maryland has never waived that immunity, *Smith v.*

*Bernier,* 701 F.Supp. 1171, 1174 (D.Md. 1988), and Congress did not abrogate that immunity

when it enacted §1983. *See, e.g., Quern v. Jordan,* 440 U.S. 332 (1979).  Therefore, absent

its consent to be sued in federal court or federal legislation abrogating its constitutional

immunity, no State official, in his official capacity, is subject to suit for claims under §1983.

### 4.    Plaintiff's Intentional State tort claims against State defendants in their official capacities, are bared by State law.

Additionally, the right to sue the State of Maryland for intentional torts[21] and its

officials is a matter of well-settled law. Ordinarily, a citizen cannot sue these entities.  The

only manner in which a citizen can sue the State of Maryland or any official is under a

---

[20]Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of an State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

[21]  In this case, those would be violations of Articles 24 and 26 of the Maryland Declaration of Rights, False arrest and false imprisonment, intentional infliction of emotional distress, loss of consortium, and assault and battery.

waiver of immunity from the State.[22]  The State of Maryland has waived its immunities and those of its officials, but subject to certain limitations. *See* Maryland Tort Claims Act ("MTCA"), Md. Code Ann. State Gov't Art. § 12-101, *et seq.*  The waiver of sovereign immunity under the MTCA is a limited waiver -- and is limited to negligence actions and claims not in excess of $100,000. State Gov't Art. § 12-104.  Moreover, sovereign immunity is not waived for punitive damages or intentional torts of State employees, Cts. & Jud. Proc. Art. § 5-522 (a)(4).

Other than claims brought under Title VII, the Plaintiff alleges only intentional torts (wrongful discharge) and Civil Rights violations under 42 U.S.C. § 1983.  Therefore, the State of Maryland has not waived its sovereign immunity and cannot be sued in this Court either directly or under a theory of *respondeat superior* with respect to claims for wrongful discharge or claims brought pursuant to § 1983.  Likewise, no State official, in his official capacity, may be sued for these claims.[23]

### 5.    Plaintiff's claims for injunctive relief are barred.

Though he fails to specify which count provides his injunctive relief, Plaintiff is demanding reinstatement to his job and "full retirement rights."  He further demands back pay and compensation for "lost pension benefits." Since the Eleventh Amendment applies whenever any relief is sought from a State or one of its agencies, Plaintiff's claims of

---

[22] Sheriffs and deputy sheriffs are "State personnel" for purposes of suits brought against them for violations of Maryland torts. State Gov't Code, § 12-101 (a)(6).  As such, they are personally immune from suit.

[23] The State defendants do not intend to challenge nor undermine the previous ruling of this Court holding that Defendants Dorsey, DeHaven, Aiello, Sohl, and Walter are county employees for purposes of Title VII.  Rather the analysis for determining an "employer" pursuant to Title VII is distinct from that which determines immunity for State personnel.

injective relief are also barred. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58 (1996)(*quoting Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. 30, 48 (1994))(Eleventh Amendment embraces demands for enforcement of equitable rights and prosecution of equitable remedies when these are asserted against a State).

**H.     Non-cognizable claims.**

    **1.     Because Title VII does not impose individual liability on supervisory employees, Boyle's Title VII claims against defendants Walter, Aiello, DeHaven, Dorsey, and Sohl must be dismissed.**

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment because of such individual's [religion]**."** 42 U.S.C. § 2000e-2(a). Title VII defines employer to include certain persons who employ fifteen or more workers and "any agent of such a person." 42 U.S.C. § 2000e(b). The Fourth Circuit has interpreted the inclusion of "agent" in Title VII's definition of employer simply to establish a limit on any employer's liability for its employees' actions. *See Lissau v. S. Food Serv. Inc.,* 159 F.3d 177, 180-81 (4th Cir.1998); *see also Haynie v. St. Mary's County*, DKC 97-3062, 2001 WL 194297, at *2 (D.Md. Feb.26, 2001). Thus, as stated by the Fourth Circuit in *Lissau*:

> Congress only intended employers to be liable for Title VII violations. Nowhere does the [Civil Rights Act] mention individual liability as an available remedy. Had Congress felt that individual liability was "needed to deter unlawful harassment and intention discrimination," surely it would have included this remedy in the 1991 Amendments. Instead, the linkable between the size of the employer and the amount of available relief clearly indicates a congressional intent to limit plaintiffs' remedies to suits against employers. To permit individual liability would improperly expand the remedial scheme crafted by Congress.

*Lissau v. S. Food Serv. Inc.*, 159 F.3d at 181.

In light of this precedent and the fact that Boyle admits Sheriff Meadows was his sole employer with the exclusive power to terminate his employment, all Title VII claims against Defendants Walter, Aiello, DeHaven, Dorsey, and Sohl must be rejected.

### 2.    Plaintiff cannot state a separate claim pursuant to Article 49B.

Insofar as Plaintiff may be attempting to assert a separate cause of action pursuant to Article 49B, this claim has no merit. *See* Count IV.   The Maryland Fair Employment Practices Law does not provide a private right of action.   Md.Code Ann, art. 49B, § 14 prohibits employment discrimination based on religion.  It does not, however, create a private right of action. *Willey v. Ward*, 197 F.Supp.2d 384, 386 (D.Md.2002); *Makovi v. Sherwin-Williams*, 316 Md. 603, 639 (1989); *Solely v. Maryland Comm'n on Human Relations*, 277 Md. 521, 526 (1976); *Dillon v. Great Atlantic & Pacific Tea Co.*, 43 Md. App. 161, 167 (1979).  *See also Childers v. Chesapeake & Potomac Telephone Co.*,881 F.2d 1259, 1266 (4th Cir. 1989).  *Accord Glezos v. Amalfi Ristorante Italiano, Inc.*, 651 F. Supp. 1271, 1276 (D. Md. 1987).  Stated otherwise, a private cause of action employment discrimination based on Article 49B is not recognized because there is an exclusive statutory procedure and administrative remedy for redress of employment discrimination in Maryland.  *Makovi v. Sherwin-Williams*, 75 Md. App. 58, 60-61 (1988), *aff'd*, 316 Md. 603 (1989).

Boyle's sole avenue of redress was to the Maryland Commission on Human Relations.  Boyle complained to the Commission on June 6, 2001.  Twenty one days later, the Equal Employment Opportunity Commission, in a work sharing agreement, reported that its investigation failed to substantiate his allegations of employment discrimination.  The

Commission found no probable cause to believe that the State of Maryland or the Harford County Sheriff's Office discriminated and/or retaliated against him on the basis of his religion or engaging in protected activity.

**I.      Summary Judgment Standard of Review**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Mere speculation on the part of the Plaintiff cannot stave off a properly supported motion for summary judgment, *Id.*, at 252; *See also Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). To survive a motion for summary judgment, a party may not rest on its pleadings, but must demonstrate that specific, material facts exist which give rise to a genuine issue. *Celotex Corp. v. Catrett*,l 477 U.S. 317, 324 (1986). In ruling on a motion for summary judgment, the court assumes that all of the non-moving party's evidence is worthy of belief, and all justifiable inferences are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**IV.   CONCLUSION.**

For all the foregoing reasons, it is respectfully requested that Summary Judgment be granted in favor of the State defendants and Harford County as to all counts in the Amended Complaint.

Respectfully submitted,

J. JOSEPH CURRAN, JR.
Attorney General of Maryland


_____/s/_____
FRANK W. MANN
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Md. 21202
(410) 576-6576
(410) 576-6955 (Fax)
Attorneys for State of Maryland