## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

**JOHN L. BOYLE, JR**                              *

        Plaintiff

                                    *

    V.

**HARFORD COUNTY, et. al.**                   *          **Civil Action No. L-013200**

        Defendants

                                    *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM IN SUPPORT OF

## ANSWER TO MOTION FOR SUMMARY JUDGMENT

      John L. Boyle, Jr., Plaintiff, by his counsel, Howard J. Needle, Esq., submits this Memorandum in Support of Answer to Motion for Summary Judgment.[1]  Because there are genuine disputes about material facts in all of the pleadings, exhibits and affidavits that are a matter of record in this case, supporting Plaintiff's claim that he was discriminated against and retaliated against by his supervisors and the Harford County Sheriff during the course of his employment at the Harford County Detention Center, and because judgment cannot be rendered as a matter of law, the Motion for Summary Judgment must be denied.

---

[1] Defendants' Motion for Summary Judgment partially constitutes a rehashing of the arguments made in Defendants' 2001 Motions for Dismissal/Summary Judgment.  Accordingly, Plaintiff's Answers to those motions, including Plaintiff's December 10, 2001 and February 25, 2002 Memoranda in Support of Answers to Defendants' Motions for Dismissal/Summary Judgment (and his Affidavits and exhibits thereto) submitted in response to Defendants' Motions for Dismissal/Summary Judgment, are incorporated herein by reference.

**TABLE OF CONTENTS**

Statement of Facts…………………………………………………………..……………3

Argument………………………………………………………………………  19

   I.  Standard of Review…………………………………………………………...19

   II.  The individual defendants are not "state defendants"…………………………..19

   III. Boyle has stated a prima facie case of religious discrimination………………..21

   IV. Boyle has made out a prima facie case for retaliation…………………………...26

   V.  Boyle has made out a sufficient claim for hostile work environment…………...31

   VI. The individual defendants do not have immunity and Boyle's state
       and county law claims are valid……………………………………………………33

          A.  His claim for wrongful discharge is viable……………………………..33
          B.  His claim for whistle blowing is viable…………………………………… 36

   VII. None of Boyle's claims are barred by limitations or the failure
        to exhaust administrative remedies………………………………………………36

          A.  State and Section 1983 claims against
              the individual defendants are viable………………………………………36
          B.  The Title VII claims are viable……………………………………………36
          C.  Boyle can bring federal claims against former Sheriff Meadows
              and his state claims are not limited
              to those occurring after December 13, 1999……………………………… 37
          D.  The Title VII claims have not failed as there has been
              an exhaustion of the administrative remedies……………………………...39

   VIII.  All of Boyle's claims are cognizable, other than his Title VII
        claim against supervisors and his claim for liability under
        Chapter 95 of the Harford County Code…………………………………………41

          A.  Boyle concedes that Title VII does not impose individual liability
              on supervisors………………………………………………………………...41
          B.  A claim under Article 49B should be valid………………………………41
          C.  Boyle must concede that he cannot assert a claim under
              Chapter 95 of the Harford County Code, but he should be given
              leave to amend his Complaint…………………………………………….46

       Conclusion…………………………………………………………….48

**STATEMENT OF FACTS**

The facts in this case have been stated many times, and will not be repeated here. Discovery has been completed, and the plaintiff here highlights significant admissions, disclosures, contradictions and genuine disputes of material facts that have developed during discovery. Also, there are many disputes with defendants' "Statement of Undisputed Facts", which will be pointed out.

A Stipulated Order of Confidentiality has been entered in the case to protect the privacy rights of several defendants. Although it was not necessary to do so, plaintiff consented to have the depositions of the defendants declared confidential in their entirety. Therefore, the deposition transcript extracts which are attached hereto as exhibits are sealed. Obviously, the Court may read those excerpts to verify the points made herein. Plaintiff notes that, apparently, no deposition transcript excerpts referred to by the defendants in their Memorandum have been attached thereto.

A very recent development is of significance. The Court probably knows, as there has been widespread news (Ex. 15), that defendant Joseph Meadows resigned under a cloud of potential criminal prosecution by the State Prosecutor for misconduct in office as the Harford County Sheriff. A new Sheriff, Thomas Golding, has been appointed. Since Joseph Meadows was the Sheriff at all times pertinent to the claims in this case, plaintiff assumes that it is proper to retain him as a defendant in this case. If the Court feels it is necessary to make Sheriff Golding a defendant in order that any verdict or judgment be rendered for or against the then Sheriff, plaintiff should be given leave to amend the Complaint in order to do so.

In trying to determine the facts and disputes of facts, an overriding observation needs to be made about the Affidavits submitted at various times by the defendants. A series of undated

Affidavits are exhibits to the Memorandum in Support of the Motion for Summary Judgment, which should be rejected for two primary reasons. First, they do not meet the requirements under Fed. R. Civ. P. 56 (e) that they must be made on personal knowledge, must set forth facts as would be admissible in evidence, and must show affirmatively that the affiants are competent to testify to the matters stated in the affidavits. Statements made upon information and belief, as opposed to personal knowledge, are not entitled to weight in the summary judgment balance." ". Cattawba Indian Tribe v. S. Carolina, 978 F. 2d. 1334 (4th Cir., 1992), Cadle Co. v. Hayes, 116 F. 3d. 957, 961 (1st Cir. 1997). On their face, the affidavits come up short of worthy of consideration or support for the motion. Such defective affidavits should not be accorded the usual probative force of a valid affidavit unless it meets the requirements of Rule 56 (e). Moreno v. University of Maryland, 420 F. Supp. 541 (D.C. MD. 1976). Every single one of the affidavits are deficient as lacking one or more of the required elements. Each states at the outset that "I am competent to testify", but glaringly omits the crucial qualification that he is competent to testify to the matters stated in the affidavit and, in fact, none of the affiants are competent to testify to all of the facts stated in their respective affidavits. Each states that the affiant has "…personnel (sic) knowledge of some of the facts contained in the Complaint based upon facts possessed by the Sheriff's Office and my personal recollection of events." The qualification that the personal knowledge is based upon facts possessed by the sheriff's office prevents the very ability for that knowledge to be personal. Each affidavit states in closing that its contents are "…based upon my personal knowledge." That conflicts with the earlier statement that at least some of the contents of the affidavit are based upon information possessed by the sheriff's office.

The second reason the affidavits are unworthy of consideration is because they are practically identical, and are patterned on and are almost a copy of (except for the last paragraph)

the Affidavit of Major Jordan Watts, attached to the State of Maryland's Motion to Dismiss and, in the Alternative, for Summary Judgment. However, the personal knowledge of all of the affiants, all individual defendants, is not at all the same, and in many instances they are in direct conflict with their depositions. "[P]arties cannot thwart the purposes of [FRCP] 56 by creating sham issues of fact with affidavits that contradict their prior depositions…" Cowan v. Prudential Insurance Company of America, 141 F. 3d. 751, 756 (7th Cir. 1998).

Space constraints will not permit analysis of all of the defendants' affidavits, but the consideration of just two of them will demonstrate the inconsistencies, contradictions and duplicity in the testimony of the defendants, creating numerous disputes among themselves of material facts. This, along with the failure of the affidavits to comply with the requirements of the Federal Rules and the fact that they are all practically identical when the knowledge of the defendants is not identical, suggests that the affidavits should be disregarded altogether or be accorded very little weight in the summary judgment equation.

Former Sheriff Joseph Meadows:

The entire transcript of the former Sheriff's deposition taken on May 1, 2003 is attached hereto as Ex. 3. The most memorable thing about it is that he did not recall very much about Mr. Boyle. He said that, or words to that effect, 56 times. However, his memory remarkably returned less than four weeks later when he apparently signed his Affidavit on or prior to May 27th or 28th, 2003, (Ex. 4), thus making a mockery of the discovery procedure. (None of the affidavits are dated, but an examination of the Meadows Affidavit discloses that it was faxed on My 27th and 28th, which means it was signed on or before one of those days.) The former Sheriff's affidavit is the same as all the others, and the various faults with his and the others will be addressed in connection with the others. Suffice it to say here that the Sheriff, whose office is not at the

Harford County Detention Center, was certainly not present at the Detention Center when the various incidents involving the plaintiff occurred. He therefore does not have the requisite personal knowledge necessary to have his totally discredited deposition and affidavit considered by this Court. His affidavit and deposition will be dissected and analyzed, but that should not be misconstrued as giving his affidavit any semblance of legitimacy. For all of the additional reasons stated hereafter that the affidavits are defective and unreliable, plus the fact that the former Sheriff's affidavit now inexplicably recites details of which he had no knowledge or recollection only a few weeks earlier at his deposition, makes his affidavit defective, incredible and utterly  incapable of supporting the Motion for Summary Judgment.

Sheriff Meadows said in his deposition (Ex. 3, 22: 17-19 and 23: 12-16) that "…I seem to recall something about him playing basketball with inmates, and that's a big no-no…Because you are supposed to be doing your other duties of watching inmates and making sure their security is intact, and you can't do that if you are in the middle of a basketball game." However, the Sheriff's Affidavit, paragraph 5 c. states that Mr. Boyle was only "shooting baskets".  (Ex. 23 attached to Defendants' Memorandum) There is a big difference between playing basketball with the inmates and shooting baskets. In fact, he was shooting baskets alone. Furthermore, he was on his break and there is no prohibition against shooting baskets in the exercise yard while on break, which he had done often. He is further accused of leaving unlocked the security door through which he entered the yard. In fact, that security door cannot be locked from inside the exercise yard. See the plaintiff's Affidavit attached to this Memorandum in Support of Answer to Motion for Summary Judgment and (Ex. 1), and Tr. 26:18-21 of the deposition of Richard Aiello, Ex. 15) Thus, one of the major negative incidents with which Mr. Boyle is charged, and

on which his termination is at least partially justified, was not negative at all. We have exposed and seen through its transparency.

On the important issue of Mr. Boyle's allegation of religious persecution, the former Sheriff said that was "nonsense". (See his deposition, Ex. 3, Tr. 33: 14-15.) When asked repeatedly the basis for his statement that an allegation of religious persecution was "nonsense", the former Sheriff offered only "Because it was not a consideration in my determination (to terminate Mr. Boyle)" (Ex. 3,Tr. 37: 9-10.) That may have been true, because Mr. Boyle was terminated solely for alleged insubordination for not obeying the order of a supervisor, and religious discrimination or persecution was not an issue in that incident. In order to try to get some clarification on why the former Sheriff considered allegations of religious persecution "nonsense" he was asked several questions related to those allegations.

"Q. Do you know if there were any investigations concerning his allegation of religious persecution?

A.  No. I can't recall.

Q. Do you recall if there is any policy regarding the carrying of Bibles into the Detention Center?

A. I don't know if there is or not.

Q. Do you recall there having been any change in any such policy?

A. I said I can't recall.

        Mr. Mann: Objection.

        Mr. Roberts: Objection

        Mr. Mann: You can answer the question.

A.  I said I don't recall. I would have to look at the Policy Manual.

Q. Do you recall ever having to address an issue involving any of the deputies carrying Bibles into the Detention Center?

A. I don't recall." (Ex. 3, Tr. 38: 2-19.)

Compare these deposition answers with the former Sheriff's Affidavit (Ex. 4, paragraph 7):

"In response to Boyle's claim that he has been discriminated against because of his religion, Boyle was merely required to follow the Sheriff's Office policy regarding bringing Bibles into the Harford County Detention Center. To my knowledge, Boyle never objected to this policy. Boyle was never restricted from bringing a small, "pocket" Bible into the Center at all times. Nor was he restricted from bringing a "full sized" Bible and storing it in his locker."

The former Sheriff, the principal individual defendant, for that matter all of the defendants, should not be permitted to submit affidavits, virtually identical, obviously prepared by counsel and using counsel's carefully chosen words, which contradict their depositions or submit answers they did not know at their depositions.

Here is another issue that renders the former Sheriff's Affidavit (Ex. 4) nugatory. At Tr. 39: 17 to  40: 2 of his deposition (Ex. 3) the following exchange took place:

"Q. Do you have any recollection of the quality of Mr. Boyle's performance of his job before the last three years of his career at the Detention Center?

A.     At some point, there was – he seemed to be getting into disciplinary issues and problems. You know, prior to that, if I don't hear something, I assume they are doing an adequate job, and that is all I can really say."

A few weeks later, Mr. Meadows miraculously remembered and was able to state in his Affidavit (Ex. 4), paragraph 5, that "Though Boyle received relatively favorable evaluations

8

during the first ten years of his career…" However, that statement was an exceedingly unfair description of Mr. Boyle's first ten (actually eleven) years of his career.

The former Sheriff's affidavit and every other affidavit demonstrate the same bias, misrepresentation and lack of any objectivity or fairness when they each state at the start of paragraph 5 "Though Boyle received relatively favorable evaluations during the first ten years of his career, his performance gradually and then rapidly began to decline…" Not only did Mr. Meadows then miraculously remember Mr. Boyle's early career, any review of the plaintiff's career, as best demonstrated by his Performance Evaluations (Ex. 5, Bate-stamped pages 322 – 382), must conclude that they were far better than "relatively favorable". They were positively exemplary. How, otherwise, could he have been selected as the State "Correctional Officer of the Year" in 1996. (Ex. 6) Consider some of the excellent commentary on the Performance Evaluations. (All of the following page references are to Ex. 5) "Dep. Boyle has an excellent rapport with the inmate population. The incident involving report # 89-1661A is indicative of how he has used this rapport to terminate a possible violent situation." (1991)  (Bate-stamped page 328). "Commented on his continued excellent job performance." (1991) (Page 334) "During this rating period DFC Boyle was awarded the Sheriff's Department Life Saving Award for his successful effort in saving an inmate who had attempted suicide… In this capacity (as the Detention Center's Property Officer) as in all tasks assigned to DFC Boyle, he performs these tasks in an outstanding manner. DFC Boyle has a good rapport with the inmates (sic) however, the inmates know that he will always act in a professional manner and that they cannot take advantage of him. DFC Boyle has demonstrated over the years that he can perform any job within the Detention Center and he is willing and ready to accept additional responsibilities. (1993) (Page 342) "DFC Boyle has an outstanding working relationship with the officers and the

inmates. DFC Boyle is often looked upon for advice from other officers since DFC Boyle is a

eight year veteran." (1995) Page (347) "Requires little or no supervision. Would make a good

Assistant Supervisor…Has a high energy level at work all the time…OFC Boyle received the

award for Officer of the Year" (1996) (Pages 350-352) "Demonstrates exceptional work habits

and job enthusiasm resulting in a superior product. Makes a substantial contribution to the

continued operation of the Detention Center. Is consistent, dependable, and accurate in carrying

out responsibilities. Demonstrates an exceptional ability to communicate and interact with

superiors, co-workers and inmates. Identifies and solves problems before they become critical.

Conveys a powerful influence in a team environment. Is a strong participant in team efforts.

Demonstrates natural leadership ability. Is a <u>charismatic leader</u>. Displays a <u>high level of personal</u>

<u>integrity</u>. Displays a <u>high degree of honesty, loyalty and integrity</u>. Is judicious in carrying out

assignments without direction or supervision. OFC Boyle continues to express his enthusiasm

for and pride in his job. His affection for his chosen field is exemplary." (emphasis added)

(1997) (Pages 355-358) "Very knowledgeable over a wide range of job responsibilities.

Performs with unusual accuracy, thoroughness and effectiveness on all post positions. Work is

always completed on time and in a superior manner. Can always be relied upon to accomplish

the best possible results and maintains a good attendance level. Always willing to help co-

worker and he is also used as a Field Training Officer. Demonstrates leadership ability in all the

work he performs. Always willing to help out fellow officers and can be trusted to make sound

logical decisions. (1997) (Pages 361-364) Same for 1998. (Pages 367-370) Things started to go

wrong for Mr. Boyle in 1998. See his Performance Appraisal (Pages 372-377) for the first six

months of 1998, which contained <u>only</u> laudatory comments, but he nonetheless received only an

"acceptable" rating. He disagreed with that rating and submitted his comments on 7/30/98,

where he said "It has been well documented in my letters to the Administration about the problems I have suddenly experienced after eleven years of dedicated service to the 12-8 shift and the Sheriff's Department overall. But again I reiterate that at no time has anything ever affected my ability to do my job as it relates to my performance of duty." (Page 378) He got a favorable review for the last six months of 1998 (Pages 379-380) For the last six months of 1999, there were some critical remarks, but the Performance Appraisal ended with "…DFC Boyle has a very good rapport with the inmates he is assigned to work with on a daily basis. DFC Boyle is an asset to the Detention Center and his fellow officers. I suggest DFC Boyle look into taking some leadership courses offered by the Sheriff's Office and/or the Harford County Comm. College." (Pages 381-382)

Thus, a careful review of the evaluations for the first 10-11 years of Mr. Boyle's career at the Harford County Detention Center discloses that they were truly outstanding if not remarkable. How, then, can the former Sheriff's Affidavit, or any of the affidavits, be credible when they call the pertinent Performance Evaluations "relatively favorable"? What conclusion can be reached other than that those words were apparently carefully chosen to misrepresent and thereby to attempt to mislead this Court?

Furthermore, Mr. Boyle was rewarded as the State Correctional Officer of the Year in 1996. See Ex. 6, a newspaper article and picture of Mr. Boyle receiving the award. There is no higher award than that in the entire state, yet the former Sheriff, amazingly, could not remember that one of his own officers, the plaintiff, won it. Consider his answer about this at his deposition, (Ex. 3, Tr. 13: 7-9):

"Q. Do you recall if Mr. Boyle ever received any awards when he was a deputy at the Detention Center?

11

A. I don't know if he did or not."

Although the former Sheriff said in his deposition that he could not recall other incidents of security breaches involving the plaintiff (Ex. 3 , Tr. 25: 3), he apparently had no trouble relating them in detail in paragraphs 5 a through e of his Affidavit (Ex. 4), after he said, in paragraph 5: "…Boyle was disciplined twice for serious breaches of institutional security rules and insubordination. Prior to that, he was repeatedly counseled for other security breaches and violations of policy…" (Incidentally, counseling forms are not disciplinary in nature. They simply call for correction of performance matters. See former Sheriff Meadows deposition, (Ex. 3, Tr. 40: 18-20) That being the case, what was the purpose of making reference to counseling in the Affidavits? To try to mislead the Court into thinking that Mr. Boyle had been disciplined when he had not?)

At his deposition, Mr. Meadows had no recollection of Mr. Boyle's complaints of harassment. (Ex. 3, page 31, line 14 to page 32, line 11) However, his Affidavit said "During his tenure at the Sheriff's Office, Boyle filed numerous complaints regarding Sheriff's office employees. Though some of his complaints were legitimate, others were either unfounded and/or greatly exaggerated. However, each and every complaint was investigated and resolved." (Ex 4, paragraph 6) It's wonderful what a few weeks can do for the memory.

Finally, with respect to the macing incident, which brought Mr. Boyle down and resulted in his termination, the incident one would expect the former Sheriff to remember if he remembered anything, he said at his deposition:

"Q. Do you recall an issue in the (macing) incident about which you have just referred – and that is the transfer of the inmate – an issue being whether or not Mr. Boyle had directions from a supervisor, to deliver that inmate to Medical because he had been affected by mace?

A. I know that it involved something to do with that issue, but I don't remember the details…

Q. Do you recall anything about the effect of the second order as it affected the first order?

A. As I said earlier, I don't remember the details. I don't recall." (Ex. 3, Tr. 15:7, 16:4)

The former Sheriff had no difficulty in his Affidavit recalling in great detail all of that incident which he did not witness and of which he had no personal knowledge. See his Affidavit, Ex. 4, paragraph 5 e (actually five paragraphs).

Thus, there are numerous contradictions and inconsistencies in former Sheriff Meadows' testimony and Affidavit on factual issues of crucial importance in this case, creating factual issues that only the jury can resolve.

Assistant Warden Richard Aiello:

Assistant Warden Richard Aeillo's Affidavit (Ex. 7,  Paragraph 5 e) recites in considerable detail the incident which resulted in the plaintiff's termination, despite the fact that Mr. Aiello did not witness the incident and therefore has no personal knowledge of it. Neither Mr. Aiello nor any of the witness reports, nor the investigation of the incident, nor the transcript of the administrative hearing state or disclose that Mr. Aiello witnessed or was at the scene when that incident occurred. (See Ex. 9, Bate-stamped pages 186-223, 233-235) (These were among the voluminous documents produced by the plaintiff with his Response to Request for Production of Documents.) Mr. Aiello's deposition taken on April 30, 2003 (Ex.15) is significant for a contrary statement.

"Q. Did you witness any of that incident? (The making incident.)

A. No, sir. I came down shortly after the incident occurred, was briefed by Captain DeHaven as to the circumstances, and then had an opportunity to review reports later." (Ex. 15, Tr. 31:6-10)

In the same paragraph 5 e of his Affidavit (Ex. 7), Mr. Aiello said boldly, and without any supporting verification or documentation of any kind that "...none of the trial board members had any known knowledge that Boyle had previously filed complaints reported (sic) alleged "religious and alleged wrongdoing on the part of his fellow employees…" The plaintiff wonders how Mr. Aiello had personal knowledge of the trial board members' knowledge or state of mind.

Mr. Aiello filed almost exactly the same affidavit previously with the Motion to Dismiss. (Ex. 8) (Please disregard the mark ups of this Affidavit, which are of no significance to the pending motion or answer thereto.) However, to his credit, Mr. Aiello apparently realized that there was an error in his first affidavit (Ex. 8) where he stated, at paragraph 6, "However, each and every complaint was investigated and resolved." The affidavit attached to the Memorandum in Support of the Motion for Summary Judgment says: "However, each and every complaint brought to my attention was investigated and resolved." Mr. Aeillo, obviously, realized he could not support his earlier affidavit which claimed every complaint was investigated and resolved. That, of course, raises the important issue of which complaints by Mr. Boyle were not investigated and resolved.

Mr. Aiello made one other perhaps significant change from his former to his current affidavit. He omitted the word "I" in the second line of paragraph 8, so that it no longer says "In response to Boyle's complaint that a Detention Center employee released his personal medical information to a third party, (I) have no knowledge that this occurred."  (Ex. 7) It is not clear

what the new sentence means without the word "I", but there is apparently an effort to retreat from the position that Mr. Aiello knows nothing of this allegation. In fact, Mr. Boyle accuses Mr. Aiello of having very improperly divulged that confidential information to an Internal Affairs investigator, which Mr. Aiello, of course, denies. Dr. Laurence Fishel, the psychiatrist to whom Harford County referred its employees who requested or needed any mental health care, asked Mr. Boyle if he could discuss Mr. Boyle's mental status with Mr. Aiello, who Dr. Fishel said he knew. Dr. Fishel had Mr. Boyle sign a release permitting Dr. Fishel to have such a discussion with Mr. Aiello. (See Ex. 1, Mr. Boyle's affidavit.) An attempt was made to obtain Dr. Fishel's records, which would have included the release and probably a note of such a conversation between Dr. Fishel and Mr. Aiello, but they, rather conveniently, purportedly cannot be located and may have been destroyed.(See Ex. 10, communications with Dr. Fishel's office, including a Memorandum dated June 2, 2003 to plaintiff's counsel from Dr. Fishel's Office Manager. This lost or destroyed document permits Mr. Boyle to nonetheless testify about its contents. FRE 1004. Thus, for the purposes of this motion, a presumption or inference should be made favorable to the plaintiff, which results in a genuine dispute of a material fact. It is very disturbing that this is one of two major pieces of evidence in this case which is missing.

As stated above, Major Jordan Watts' Affidavit was attached to the State of Maryland's Motion to Dismiss and, in the Alternative, for Summary Judgment, and that affidavit formed the basis for and was all but copied as the new set of affidavits filed with the pending Motion for Summary Judgment. One significant difference between Major Watts' Affidavit and all of the currently filed Affidavits pertains to the basketball incident in the recreation yard. Major Watts said Mr. Boyle was "playing basketball" (page 2 of his Affidavit), whereas the current round of affidavits say he was "shooting baskets" (page 4 of the more recent affidavits). Therefore, there

is a genuine dispute of a very material fact, even between the defendants' witnesses. As pointed out above, the difference between playing basketball and shooting baskets is significant in this case. Playing basketball suggests or infers that he was playing with the inmates, which he was not. He was merely shooting baskets alone. (See Plaintiff's Affidavit, Ex. 1.)

Last, but certainly not least, there is a real suspicion about Mr. Aiello's signature on his affidavit attached to the Memorandum in Support of the Motion for Summary Judgment (Ex. 7). Compare it to the signature on his almost identical affidavit attached to the Memorandum in Support of the Motion to Dismiss (Ex. 8) These Affidavits are successive exhibits hereto to make comparison more convenient. The first one is easily read as "R M Aiello", whereas the signature on the current affidavit does not resemble the first signature at all, and appears far from spelling Richard Aiello. This should render the affidavit ineffective and unworthy of consideration at the least, and is another very disturbing development if one of the signatures is not genuine.

DISPUTES WITH DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

As with the affidavits, the defendants state at page 5 of their Memorandum that Mr. Boyle received "…relatively favorable evaluations during the first ten years of his career…" As pointed out above, that is an unfair and inaccurate description of the plaintiff's outstanding performance over 11 years. Then they say that his "…performance gradually and then rapidly began to decline." That is vigorously disputed, as both of the disciplinary actions taken against him were unjustified. Defendants then list on pages 5-10 "Boyle's disciplinary record", including counseling forms which are admitted by everybody to be non-disciplinary. The defendants harassed Boyle for 3 years, trying to force him to quit, subjecting him to non-stop investigations,

restrictions of duty, and charges after he reported corruption and harassment or asserted his
LEOBR rights (such as requesting a Hearing Board).

The write up of the November 25, 1998 counseling form is a gross misrepresentation, as
Mr. Boyle strongly protested this charge of promising to help an inmate obtain a money order to
pay his charges at the Detention Center, for both the Warden and Assistant Warden found no
fault. (Ex. 1)

A fair statement describing the counseling statement of December 21, 1998 (not
December 14, 1998) would disclose that Mr. Boyle admitted that he had opened two doors in the
dormitory area at the same time, yet he was harassed by an investigation that followed that
admission for 4 months with respect to other charges that were unfounded and dropped. (Ex. 1)

The defendants' description of the "shooting baskets" incident is a distortion of the truth.
Even former Sheriff Meadows disagrees with it, stating in his deposition that Boyle was
disciplined because he was playing basketball with inmates. The description does not disclose
that Boyle was off duty at the time. It charges him with leaving an emergency door open, but
fails to state that this door does not lock from the inside and leads only to an interior hallway, so
no inmate could have escaped by leaving through the unlocked door. It is totally misleading to
state that Boyle was removed from the list of eligible exercise officers without disclosing that he
was made the exercise officer one month after this incident. (Ex. 1) There is far more about this
incident, but space simply does not allow for it to be told here.

As for the September 25, 2003 day suspension, the defendants' description states that
Boyle turned down an offer of a postponement on the day of the hearing. Of course, it does not
disclose that Boyle's request for a postponement had originally been rejected by former Sheriff
Meadows despite 3 extensions of time, spanning 5 months, given to the Sheriff's Office to

prepare its case. At the time of the hearing, Boyle was busy preparing his defense against 6 other

bogus charges, especially the major one, the macing incident, which resulted in his termination.

Therefore, he declined the last minute extension in order to get this matter behind him so that he

could concentrate on the others. The defendants' description also doesn't disclose that the

extension of time immediately before the hearing was offered only because the prosecutors had

violated the LEOBR. In addition, it does not disclose that Mr. Boyle declined to testify at the

hearing because Warden Walter was in attendance, and he had shortly before yelled at Mr. Boyle

to keep his opinions to himself. Thus, Mr. Boyle felt intimidated by the circumstances. (It is

interesting to note that a transcript of that hearing was not produced by the defendants. (Ex.1)

Much could be written about the leak of sensitive and confidential information involving

Mr. Boyle's visits to Dr. Lawrence Fishel, the state's psychiatrist, who he visited because of the

intense stress he suffered at the hands of the defendants. Space constraints compel the plaintiff to

simply refer the Court to the plaintiff's Affidavits and his Time Line (Ex. 12 attached to

defendants' Memorandum in Support of Motion for Summary Judgment). It is well known, and a

vital and major principle in the medical profession, that communications between doctor and

patient are confidential unless waived. Nonetheless, defendants state at pages 11-12 of their

Memorandum that "Boyle produces no evidence that…the information discussed was prohibited

from disclosure, or the existence of any confidentiality agreement regarding the information."

Since when is information discussed by doctor and patient not prohibited from disclosure, or that

a confidentiality agreement is the only way to prohibit its disclosure? Such a haughty response

suggests that the extremely sensitive information was leaked, but that there was no prohibition

against doing so.

Listed as an incident which occurred on September 1, 2000, on page 15 of defendants' Memorandum, they justify not interviewing Mr. Boyle for the exercise officer position he wanted very much by stating that the job posting excludes all applicants "currently under disciplinary action." Mr. Boyle's hearing had not yet been held. Is an officer guilty before even having a hearing? This certainly suggests that the administration already had found him guilty.

## ARGUMENT

### I.     STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show there is no genuine issue as to any material fact and either party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In considering a motion for summary judgment, all facts and inferences must be viewed in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986).

### II. THE INDIVIDUAL DEFENDANTS ARE NOT "STATE DEFENDANTS".

The Plaintiff is amazed that the individual defendants take the position throughout their argument, and rely very heavily upon the bold and arrogant assumption, that they are "state defendants". This they do so despite the Order of this Court on  December 6, 2002 holding that the Sheriff  is a Harford County employee for the purposes of this suit. This Court found that, pursuant to the reasoning in Dotson v. Chester, 937 F. 2d. 920 (4th Cir. 1991). "…Because the sheriff was acting essentially as a county policy maker in operating the jail, the Dotson Court held that the county was responsible for his decisions regarding how to run the facility. Id. at 929-30. In the instant case, the sheriff's decision to fire Mr. Boyle is tied to his management of the jail. The Court, therefore, finds that he was acting as a County policy maker and the County

will bear responsibility for his decisions, should liability ultimately be found." Surely, that ruling regarding the sheriff would be applicable to the other individual defendants, who were performing their duties managing the Harford County Detention Center at all times pertinent hereto, rather than performing law enforcement functions that could make them state employees when doing so.

This Court, by the aforesaid Order, dismissed the State of Maryland from this case, and one would then think the Attorney General's Office would no longer be participating in it. In it's Memorandum of September 19, 2002, this Court had earlier stated, at page 5, "In allowing the Title VII claims to go forward against the State, the Court is mindful of the inequity of compelling the State to participate in a protracted discovery process simply to determine the single issue that could dismiss it from this lawsuit altogether…".  Obviously, this Court wanted to determine early in the proceedings if the State was a proper defendant in the case as, if it was not, the State and the Attorney General's office should be relieved from having to expend their resources participating in the case. Strangely indeed, the Assistant Attorney General has taken the lead counsel position in the case, and has conducted the case on behalf the individual defendants, calling them "state defendants" when they are not. This Court's Order of December 6, 2002 was  entered after the respective positions of the parties were very fully briefed and argued orally.  It is the law of this case and therefore there are no "state defendants". That battle was fought, and the State prevailed and was dismissed from the case. It is indeed strange that the State now takes a position contrary to the position it has previously taken (and prevailed upon), and wants to claim the individual defendants as its employees, and defend them in this case. That's not exactly being a moving target. It's being a re-appearing target. It got dismissed, but now tries to return in another guise. Of course, the reason is obvious. The State has certain

immunities not enjoyed by Harford County, and it wishes to hide the individual defendants behind that shield. That was well known when the argument was fought as to what unit of government those individual defendants belonged to. That was not an academic exercise with no consequences. The consequences were known and appreciated when positions were briefed and oral arguments were made, when the Court held a hearing to resolve this issue, on November 26, 2002. Why then did the State argue that those individual defendants were not State employees if it wanted to invoke state immunities on their behalves? The questions are rhetorical, and, as interesting as this turn of events is, they need not be answered. The Court must rule that the immunities invoked by the Assistant Attorney General are inapplicable to the individual defendants, as they are Harford County employees per this Court's earlier binding decision on the issue.

This actually disposes of about two-thirds of the defendants' arguments in their Motion for Summary Judgment, as the arguments of qualified immunity (pages 24-25 of defendants' Memo), other immunity arguments, such as claims against the state being barred by the Eleventh Amendment (pages 35-36), immunities under Counts I-VI and VIII (pages 36-37), Section 1983 claims are barred against the individual defendants in their official capacities (pages 37-38), that intentional tort claims asserted against the defendants in their official capacities (pages 38-39), and claims for injunctive relief (pages 39-40) are without merit because of this Court's ruling on December 6, 2002. Defendants' arguments are dependent upon the Court finding that the individual defendants are state employees, which this Court has already rejected. Thus, it is actually unnecessary to address those issues, but some will be addressed later as the plaintiff cannot take the chance that the Court will agree with the defendants.

## III. BOYLE HAS STATED A PRIMA FACIE CASE OF RELIGIOUS

## DISCRIMINATION.

Title VII forbids discrimination on the basis of religion, which is broadly defined in the Act.

"The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

As Mr. Boyle says in his Affidavit (Ex. 1) and deposition (Ex. 2 , Tr. 18:14-18, 20:10-13), not only was it a comfort to him to carry his Bible in the Detention Center where there were numerous tense moments, he felt it was his religious duty to obey the word of God and spread it to others. It was his unique position, because he had the trust of the inmates, that he was able to carry out his religious practice to discuss religion and the Bible with inmates, often reading to them verses from it. This was vitally important to Mr. Boyle, as religion was an all-consuming passion in his life, and he considered proselytizing with the inmates as his sacred duty. Thus, any interference with these activities was a denial of the plaintiff's sincerely held, professed, routine, and well known religious practices. Ironically, denying Mr. Boyle the ability to carry out this religious practice was counter-productive to the best interests of the Detention Center. It is noteworthy that the defendants do not proffer, as they cannot, that there was an overriding inability to reasonably accommodate Mr. Boyle's religious practices without an undue hardship on the conduct of the Detention Center, and that his activities therefore had to be stopped. In fact, they offer no justification for the rescission of the prior policy that allowed the carrying of Bibles into the Detention Center and their reading to the inmates. Surely carrying a Bible and

discussing it with inmates did not constitute a security risk. It was Mr. Boyle's relationship with the inmates and his ability to soothe and satisfy them with stories of and verses in the Bible that so often defused what were or were likely to become uprisings or individual outbursts or flash points by the inmates. This was a major reason Mr. Boyle was honored as the State Correctional Officer of the Year while he was allowed to carry out what he considered his religious duty with the inmates. (Boyle Affidavit, Ex. 1)

"The Religious Freedom Restoration Act of 1993, 42 USCA 2000 bb was passed by the Congress to reverse prior Supreme Court and other court decisions that decided cases involving governmental actions that substantially burdened a religious practice by assessing if there was a "compelling governmental interest" in imposing the restriction in question. Sherbert v. Verner, 374 U.S. 398, 402-403 (1963) was the leading case, and many others followed it. The Supreme Court changed that in 1990 in Employment Division v. Smith, 494 U.S. 872, by holding that a law or policy that is religion-neutral and generally applicable does not violate the Free Exercise Clause of the First Amendment if it incidentally affects religious practice, thereby eliminating the requirement that the government justify burdens on religious exercise even in cases where laws or policies are neutral toward religion. The RFRA reinstated the compelling interest test and provides a cause of action to persons whose religious exercise is substantially burdened by a government. If that is the case a strict scrutiny standard requires the government to prove it had a compelling interest in the religious restriction. "In analyzing a claim under RFRA, we look first at whether a substantial burden has been imposed on the exercise of sincerely-held religious beliefs, and then determine whether the state can justify the imposition of that burden…" Goodall v. Stafford County School Board, 60 F. 3d. 168, 171 (4th Cir. 1995). It was a substantial

burden in this case now before the Court where the defendants' actions forced the plaintiff to refrain from his normal sincerely-held and religiously-motivated activities and conduct.

As an exceedingly religious person, who always carried his Bible with him and proselytized inmates, Mr. Boyle's membership in a protected class is clear, and the defendants do not challenge it. (Defendants comment that Mr. Boyle did not bring his Bible with him to his deposition. He did not do so because his attorney advised him to bring nothing with him to the deposition. Ex. 1.) The defendants do challenge Mr. Boyle to show that he was doing his job satisfactorily, as they claim he was terminated for non-discriminatory legitimate reasons. For the first 11 years his career as a correctional officer was sterling. In fact, a review of his Evaluations and Performance Appraisals up to the day he was terminated do not disclose any significant problem in his job performance. (Ex. 3 attached to plaintiff's Memorandum in Support of Answer to Motion to Dismiss.) His Evaluations and Performance Appraisals make absolutely no mention of the 3 "serious infractions" which the defendants claim justified his termination. Each of the supposed infractions have been explained away in a manner which a jury could find believable and reasonable. The motivations for prosecuting each of those infractions is extremely suspect. Retaliation for several of its officers being reported as engaging in criminal, illegal or wrongful conduct, and the embarrassment that has caused those involved and the administration of the Detention Center, is one of the obvious and acceptable explanations. He is entitled to at least that inference at this crucial stage of these proceedings.

The underlying motivation behind Mr. Boyle's everyday conduct, including the way he conducted himself on the job, is his extraordinarily strong religious faith. His religion-based high sense of ethics and revulsion for corruption, criminal and wrongful conduct compelled him to disclose and report such conduct wherever he saw it. Furthermore, his religion-driven

sense of fairness and decency, a rare commodity among correctional officers, made him a favorite of the inmates. He was the person called upon to, and often without being called upon, extinguish the fires raging in some inmates. That, combined with the whistle blowing, caused embarrassment to the management of the Detention Center and especially those correctional officers who were targeted by Mr. Boyle's disclosures. They had to eliminate the source of that embarrassment, and conspired to get the plaintiff fired. Thus, there is both direct and indirect evidence, the cumulative probative force of which supports a finding, or at least a reasonable inference, that the adverse employment actions, especially termination, was retaliatory. Chalmers v. Tulon Co., 101 F. 3d. 1012, 1017 (4th Cir. 1996). With the wealth of genuinely disputed facts surrounding this issue, summary judgment cannot be granted.

Defendants claim at page 33 of their Memorandum that "...nothing about his employment at the Detention Center, or Dorsey's directive, interfered with his religious beliefs, practices or observances." Indeed, nothing the defendants did or said could change his strongly held beliefs, but they certainly restricted and interfered with his practices and observances at the Detention Center, as stated extensively in this Memorandum and the record in this case.

The defendants claim there was too much time that elapsed from the date the existing order permitting the carrying of Bibles in the Detention Center and discussing them and religion with inmates was rescinded and his termination for there to be established any causation between the two. That is wrong for two reasons. First, the violation of the plaintiff's religious rights by the rescission of said order was among the earliest of many acts of harassment, the cumulative effect of which led to the plaintiff's termination. In other words, that was a major act among a continuum of wrongful acts that caused the plaintiff's

termination. A well known analogy would be the tolling of a statute of limitations under such circumstances. The second reason, or perhaps just another way of saying the first reason, is that the cases consider the lapse of time as only one factor in determining causation.

Here, the defendants have not accurately or fairly represented the cases they cite for the proposition that the Court (simplistically, they infer) must conclude that causation is broken by the lapse of time in this case. The defendants cite Conner v. Schnuck Markets, Inc., 121 F. 3d.1390 (10th Cir, 1997) and attribute to it on page 37 of their Memorandum "noting that four-month lag is not enough to justify an inference of causation". Compare that with what the Court actually said at page 1395: "…In this case, however, the four month time lag between Conner's participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation…" (emphasis added) Likewise, with defendants' citation of Vandever v. St. Mary's County Sheriff's Office, 2001 WL 589989, apparently an unreported opinion, where the defendants attributed to that case, at page 36 of their Memorandum: "…that a five-month lapse between the Sheriff's knowledge of the plaintiff's protected activity and his decision to terminate the plaintiff's employment was too long to support of (sic) a finding of retaliation…" The defendants conveniently omitted the opening clause of that sentence, which qualified its meaning: "Absent any other showing of a causal connection…" The plaintiff easily satisfies what is the law, as there are many intervening acts of harassment which arise as a result of the defendants' dislike for and embarrassment over the plaintiff's engagement in protected activities in this case, whistle blowing and the exercise of his religious beliefs.

## IV.     BOYLE HAS MADE OUT A PRIMA FACIE CASE FOR RETALIATION.

Title VII contains protection against retaliation when an employee exercises rights guaranteed by the Act. 42 USCA 2000e-3(a) provides that it shall be unlawful for an employer to

"…discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this title."

As a result of Mr. Boyle's opposition to the defendants' illegal denial and obstruction of his legitimate religious activities as explained above, they have retaliated against him by harassing him in the many ways already set forth several times in this case, ultimately resulting in his termination. That can be proven by both direct and indirect evidence as already explained, and he is at least entitled to that inference at this time. This, of course, is one of the ultimate jury questions at the conclusion of the trial which must proceed.

Also, there has been retaliation for Mr. Boyle's whistle blowing activities. Section 95-11 of the Harford County Code declares it to be unlawful for any person to retaliate against the plaintiff because he lawfully opposed acts or the failure to act when the Constitution and/or laws were being violated by any supervisory  personnel at the Harford County Detention Center or Harford County. Mr. Boyle became so well known for his whistle blowing activities that he was saluted as the State Correctional Employee of the Year in 1996. (Ex. 6) That was when John O"Neill, now the Administrative Officer of Harford County (the second in command in the county) and Harford County's corporate designee in this case, was the Warden of the Detention Center, who tried to run a law abiding operation at the county jail. Mr. Boyle was a big help to him, largely because of his whistle blowing, and Mr. O'Neill appreciated it. Things changed when Howard Walter became the Warden upon Mr. O"Neill's ascendancy to his present position. Whistle blowing was no longer appreciated. (See Mr. Boyle's Affidavit attached to the Memorandum in Support of Answer to Motion to Dismiss.) Mr. Boyle had to be put in his place. The many harassing activities and actions began, creating a very hostile work environment for

Mr. Boyle, ultimately resulting in his wrongful termination. It doesn't take much to realize, in fact one must be quite naïve not to realize, that this was retaliation for the plaintiff's whistle blowing and religious activities which made him look too good in the eyes of the inmates as compared to the defendants and other deputies. (Ex. 1) When one realizes the transparency, invalidity and inequity in the two (the defendants claim three) disciplinary actions taken against Mr. Boyle, as explained elsewhere herein and in the exhibits attached hereto and in plaintiff's Memorandum in Support of Answer to Motion to Dismiss, there remains hardly any doubt that the explanation for the harassment received by Mr. Boyle was motivated by retaliation. The jury must be permitted to consider the multitude of material facts in genuine dispute in deciding if the actions of the defendants were retaliatory.

One incident, in particular, is mentioned as a very understandable reason for retaliation against Mr. Boyle. Mr. Boyle reported to Assistant Warden Aeillo that Mr. Sohl had engaged in improper activity with a female inmate which, if verified, could have resulted in his termination. The plaintiff will not here reveal any of the details of that matter, out of sensitivity for any right to confidentiality with respect thereto which might exist. Pages 9-14 and 89-93 of Mr. Aiello's deposition are attached hereto (in a sealed envelope) (Ex 15) which address that incident. Suffice it to say that Mr. Sohl could not have been very pleased with Mr. Boyle for having blown the whistle on him. Any reasonable juror could very well conclude that Mr. Sohl's natural reaction would be serious irritation with Mr. Boyle. Plaintiff contends that was a motivating factor when he intercepted Mr. Boyle while he was carrying out an order from the supervisor in charge and was taking an inmate who had breathed mace to medical. Despite that order and despite Detention Center policy requiring that an inmate who receives mace be taken quickly to medical, Mr. Sohl deliberately stopped and confronted the plaintiff, giving an order he should not have

given, causing Mr. Boyle so much trouble that he was terminated as a result. That's retaliation. At the very least, there's an inference of retaliation sufficient to require the denial of summary judgment.

The leading and very recent case of <u>Clark County School District v. Breeden</u>, 121 S. Ct. 1508 (2001), while it ruled against the plaintiff therein, sets forth the following criteria that must be satisfied in order to sustain a retaliation claim for opposing illegal practices: (1) that the plaintiff has engaged in protected activity (whistle blowing and religious practices), (2) that the employer has taken an action that adversely affects the employee (stopping the religious activity, suspending and terminating the plaintiff), and (3) that the employer took the adverse action because of the employee's protected conduct. This third element of this kind of retaliation is the only one where there could be any doubt that it is satisfied by Mr. Boyle. However, for all of the reasons stated elsewhere in this Memorandum, plaintiff's prior Memorandum in Support of Answer to Motion to Dismiss, his affidavits and exhibits there is a great deal of direct and indirect evidence, especially in light of the flimsiness of the defendants' asserted legitimate reasons for disciplining and terminating the plaintiff, that the defendants' adverse employment actions against the plaintiff were retaliatory. This, too, is an ultimate issue in this case, which the jury should be given an opportunity to determine.

<u>Pettway v. American Cast Iron Pipe Co.</u>, 411 F. 2d. 998, (5th Cir. 1969) showed that a wide breadth is to be given the scope of the judicial review of assertions that Section 704 (a) of 42 U.S.C.A. 2000e-3(a) have been violated. "…In unmistakable language it is to protect the employee who utilizes the tools provided by Congress to protect his rights…" Id., at 1005. That Court then quotes the Supreme Court: "A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in

good faith." <u>NLRB v. Burnup and Sims, Inc</u>, 379 U.S. 21, 23 (1964). And, of course, plaintiff herein claims defendants were not acting in good faith, making it even more necessary to assure the statutory  protection to Mr. Boyle. The Court in <u>Pettway</u> continued, that  "…abundant support can be found under such Acts for the conclusion here that protection must be afforded to those who seek the benefit of statutes designed by Congress to equalize employer and employee in matters of employment." Id., at 1006. The Court found that support in <u>Nash v.Florida Indus.</u> <u>Com'n.</u>, 389 U.S. 235 (1967) where, at 238, it said: "Congress has made it clear that it wishes all persons with information about such practices [unfair labor practices] to be completely free from coercion against reporting them to the Board." The  <u>Pettway</u> Court went on: "…The balance is therefore struck in favor of the employee in order to afford him the enunciated protection from invidious discrimination, by protecting his right to file charges. …the price is too high…to allow the Employer to discharge the employee, <u>and worse, throw out all of the charges with the</u> <u>awesome finality of a common-law demurrer</u>…" (emphasis added) Id., at 1007.

The defendants complain that the Complaint (presumably, they mean the Amended Complaint) is not sufficiently detailed to apprise them of the basis of the complaint and the legal grounds on which it is based. It is hard to imagine a more detailed Amended Complaint, especially with the attached letter sent by plaintiff's counsel to Harford County under the Local Government Tort Claims Act listing in separate paragraphs 36 incidents affecting the plaintiff, without running afoul of the federal pleading rules. Fortunately, Mr. Boyle was a good record keeper and prepared the very detailed Time Line of pertinent events, attached to defendants Memorandum as Ex. 12. The defendants or the Court would probably have been critical if plaintiff had stated or submitted more detail. Defendants could not be serious in suggesting they did not know Mr. Boyle was complaining about retaliation because of his whistle blowing and

religious practices. Their extensive discovery covering that subject belies and lays bare the disingenuousness of such an assertion

Brief mention needs to be made again about the defendants' repeated misuse of the word "discipline" when describing the job action taken against the plaintiff for shooting baskets in the exercise yard. The defendants do that again when they argue that Mr. Boyle has not proven pretext in the context of his retaliation claim. At page 41 of their Memorandum, they say "…he has been disciplined for specifically violating rules while in the exercise yard." They know he only received a counseling form and was not disciplined, they know the distinction between them is important, yet they deliberately insist upon trying to mislead the Court to think the plaintiff had a disciplinary record he absolutely did not have.

### V. BOYLE HAS MADE OUT A SUFFICIENT CLAIM FOR HOSTILE WORK ENVIRONMENT.

Defendants properly indicate the four elements of a claim of a hostile work environment. There is no argument about the law here. Whether the plaintiff has established a prima facie case of hostile work environment that must go to the jury turns on the facts of this case. Mr. Boyle's Affidavit (Ex. 1)indicates how sincerely and forthrightly he regards his religiosity as the central core of his being. Those who know him confirm that. (See the Affidavits of Robert Scott, Ex. 11, and Alan Baliko, Ex. 12) Many others at the Detention Center, whose depositions were not permitted to be taken, when placed under oath at trial, will admit that too. To be denied the ability to practice his religious activities at work, as described above, created a very hostile work environment for the plaintiff, not even considering the religiously derisive comments of some of the defendants, such as calling him "Religious Freak" and "Bible Thumper." (See the Affidavits of Robert Scott, Ex. 11, and Alan Baliko, Ex. 12.) The defendants attempt to make light of this,

but to the plaintiff, it weighed on him very heavily. His Affidavit (Ex. 1) details more than adequately the extent of his religious activities at the Detention Center before he was told he could no longer practice them, and the extent of the hostile work environment as a result and the frequent nasty remarks and attitudes with respect thereto by the defendants and other members of the administration there. These were not simple good-natured teasing, as the malicious attitude of some of the defendants deliberately cut to the heart of the plaintiff's belief system. There's nothing funny about that.

Robert Scott, who was a correctional officer at the Harford County Detention Center at the time pertinent to this case, stated in his Affidavit (Ex. 11) quite a few examples of disparate treatment of Mr. Boyle. An investigation was apparently never undertaken, and no charges were brought against Wayne Rumsey, an officer who sexually harassed a female inmate. He tells of no discipline and preferential treatment given to union members, who had threatened both Mr. Boyle and Mr. Scott. He relates that Mr. Boyle told Mr. Dorsey about Officer Wheeling stealing from inmates, but Dorsey ignored it and no investigation was undertaken. Corruption, cover ups and gag orders were routine, according to Mr. Scott. On the other hand, he reports about the harassment Mr. Dorsey, in particular, heaped on Mr. Boyle. (Ex. 11)

Alan Baliko, a correctional officer at the Harford County Detention Center from 1998 to 2002, whose Affidavit also relates the religiously discriminatory remarks made about Mr. Boyle, and the preferential treatment given officers, union officials, who made them. He tells about actions taken against Mr. Boyle, and only Mr. Boyle, that must be characterized as hostile and harassment. One incredible incident he relates involved Officer Potvin who brought a gun into a high security area, but was not disciplined and a gag order was issued and the incident covered up. (Ex. 12)

Mr. Boyle's Affidavit, prepared without the assistance of counsel, except for the cover page, said, in part:

"Lt. Dorsey, with full approval from the highest levels of the administration wanted to retaliate against me for reporting corruption and harassment-causing "waves" if you will. They knew (as well as every officer and inmate at the jail) that the Bible meant everything to me and they could strike out and hurt me most by taking it away and restricting it's use…

…As the administration attacked the practice of me carrying my Bible, I felt very intimidated and insulted. Officers and inmates alike started questioning why I did not carry my Bible anymore. I had some officers come to me saying other officers where (sic) making fun of me-especially the Union officers who had previously vowed to get back at me for exposing them. I felt ridiculed and embarrassed that I had to hide my faith by keeping my Bible out of sight…

…Instead of help, I received numerous charges against me, investigations, interviews, polygraph examinations, shift transfers, and denial of certain job opportunities. The reason for this action was two fold, 1. it kept me busy, always defending myself, hence keeping me from exposing the corruption that I saw all around me and 2. it sent a message to the entire jail that if you insist on exercising your individual rights and stand up for what you believe you will be isolated, banned, investigated, accused, and charged with insubordination…" (Ex. 1)

These actions by the defendants and the hostile atmosphere they created affected the plaintiff's mental health, and caused him to seek counseling from the state psychiatrist, only to find that the confidentiality of his communications was invaded by defendant Aiello and told to others at the Detention Center. (See plaintiff's Affidavit, Ex. 1) That embarrassment obviously changed the terms and conditions of his employment. Indeed, the plaintiff's workplace became

"permeated with discriminatory intimidation, ridicule and insult", the hallmarks of a hostile work environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).Not only did Mr. Boyle report this to Mr. Aiello, the Assistant Warden who had substantial authority to deal with it and make it known to the Warden and Sheriff, but this was the kind of open and pervasive religious harassment that surely put the defendants on notice of the hostile work environment being created by them and others and being endured by Mr. Boyle. Thus, he does establish sufficient direct and indirect proof of vicarious liability for former Sheriff Meadows and Harford County. In fact, the plaintiff's direct supervisors, the defendants, carried out these demeaning activities, thereby imposing liability on the Sheriff and Harford County. Faragher v. City of Boca Raton, 524 U.S. 775, 803 (1998).

The defendants suggest on page 43 of their Memorandum that there was a legitimate concern about fraternization between a correctional officer and inmates which justified denying Mr. Boyle the right to teach and proselytize the inmates, citing a 6th Circuit case. This has never been suggested before, there are no memos or counseling forms suggesting any such concern, and none of the defendants have suggested that in their depositions or their affidavits. To the contrary, Mr. Boyle's relationships with the inmates was so positive that it was often used to quell their unrest, and he was rewarded as the State Correctional Officer of the Year as a result.

## VI.  THE INDIVIDUAL DEFENDANTS DO NOT HAVE IMMUNITY AND BOYLE'S STATE AND COUNTY LAW CLAIMS ARE VALID.

The defendants argue that the individual defendants are not "persons" within the meaning of Section 1983 and that "A suit against a State employee in his official capacity is tantamount to a suit against the State of Maryland." (citations omitted) See defendants' Memorandum at page24. However, this Court has ruled in this case that the Sheriff (and, inferentially, the other

individual defendants as well) are Harford County employees for the purposes they served while administering the operation of the Harford County Detention Center. Their arguments about Eleventh Amendment immunity, and non-waivers thereof, are, for the same reason, also inapplicable. Also, the same is true in response to their arguments about injunctive relief sought against the state.

### A.  HIS CLAIM FOR WRONGFUL DISCHARGE IS VIABLE.

Plaintiff concedes that he does not have a cause of action for abusive discharge based upon a violation of public policy. "…It is clear that when a remedy is available under Title VII or Art. 49B, an action for wrongful discharge will not lie in Maryland." Kerrigan v. Magnum Entertainment, Inc., 804 F. Supp. 733, 735 (D. MD, Judge Legg, 1992) More on this later.

Defendants challenge plaintiff's right to pursue the counts for wrongful discharge because he supposedly did not pursue the statutory remedy available for those claims, citing Article 49B of the Annotated Code of Maryland, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. Section 1983.

Plaintiff did avail himself, as required, of the relief available under Article 49B. He filed a Charge of Discrimination, based on religious discrimination and retaliation, with the Maryland Human Relations Commission. (See the two Charges of Discrimination attached to the Complaint.) He received the "right to sue" letter from the EEOC (also attached to the Complaint), and filed this suit within the requisite 90 days of that notice. There is nothing he did not do that disqualifies him from bringing this claim for wrongful discharge based on those violations.

Also, this suit is properly brought pursuant to Title VII and Section 1983.

Defendants challenge Mr. Boyle's wrongful discharge claim under the Law Enforcement Officers Bill of Rights (LEOBR), COMAR and the Harford County Detention Center Policy and Regulations. Paragraph 8 of plaintiff's prior Affidavit (attached to plaintiff's Memorandum in Support of Answer to Motion to Dismiss) makes clear that Sheriff Meadows made the LEOBR applicable to and enforceable by all of the Correctional Officers at the Harford County Detention Center, which the former Sheriff Meadows admitted at his deposition (Ex. 3, Tr. 25:21-26:1), a class was taught to the officers about the provisions of the LEOBR, all hearings were supposedly conducted in accordance with the LEOBR, and all who participated in those hearings thought the LEOBR was applicable thereto. In fact, at the hearing held on September 7, 2000 (see the first page of the transcript, Exhibit 6 attached to the State of Maryland's Motion to Dismiss), an indication of the intention to follow the LEOBR. (Exhibit 19 attached to the Memorandum in Support of Answer to  Motion to Dismiss.) The Harford County Sheriff's Office Summary of the Law Enforcement Officer's Bill of Rights used in the plaintiff's hearing is Exhibit 20 attached to the Memorandum in Support of the Answer to Motion to Dismiss. With all of this proof of the applicability of the LEOBR to the plaintiff, all of it in the words of or at the behest of the Sheriff, how can the defendants now disavow its applicability and enforceability? Of course, they are the same defendants who now call themselves state defendants after arguing, and prevailing, that they were not. Their lack of consistency and reversals of positions previously taken are troublesome.

The defendants also misstate the provisions of Section 734 of Article 27 of the Annotated Code of Maryland, when they say (page 12 of their Memorandum) "Section 734 permits Boyle to seek judicial review from the circuit court if he was dissatisfied with the decision of the agency." In fact, its provisions are limited to a proceeding for a show cause

order by the Circuit Court prior to the commencement of the hearing. It does not address in any way "judicial review from (sic) the circuit court if he was dissatisfied with the decision."

### B.  HIS CLAIM FOR WHISTLE BLOWING IS VIABLE.

The plaintiff has already herein established the nexus between his religious activism and his exposure of corruption and wrongdoing at the Detention Center and his termination. As well, plaintiff has already discredited the supposedly legitimate non-discriminatory reasons defendants propound for plaintiff's termination. The two or three "serious infractions" were neither serious nor were they infractions. They were contrived and transparent, and the jury should be permitted to consider them for what they were.

As has been stated above, the cumulative effect of all, or almost all, of the adverse employment actions which the defendants took against the plaintiff constitute evidence of a conspiracy or concerted action to retaliate against him for whistle blowing. The fact that Mr. Boyle had an outstanding career as a correctional officer for Harford County for eleven years, marked conspicuously by his whistle blowing activities, and that he suddenly began to get into trouble and be cited for infractions and violations of procedures which are inconsequential or bogus, or at least questionable, suggests they were mere pretext for retaliation for whistle blowing which embarrassed the Sheriff's Department or individual deputies.

## VII. NONE OF BOYLE'S CLAIMS ARE BARRED BY LIMITATIONS OR THE FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES.

### A.  STATE AND SECTION 1983 CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE VIABLE.

For the many reasons stated throughout this Memorandum, the state and Section 1983 claims against the individual defendants are viable, and space limitations do not permit their restatement here.

## B.  THE TITLE VII CLAIMS ARE VIABLE.

Section 2000e-2(a) of the U.S. Code, enacted as part of the Civil Rights Act of 1964, provides:

"It shall be an unlawful employment practice for an employer –

1.      to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin…"

Prior to 1991, many courts decided the liability issue under the above statutory provisions, in a mixed-motive case where there was evidence of both legitimate and illegitimate reasons for an adverse employment action, on the basis of whether the employer could prove that it would have made the same adverse employment decision because of legitimate employment concerns, even if the discrimination issue had not also motivated that decision. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

The Congress was not happy with that line of decisions, and enacted in 1991 new standards in mixed-motive cases, such as the instant case. The new Section 2000-2(m) provides:

"Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

The Supreme Court only days ago, on June 9, 2003, decided <u>Desert Palace, Inc., dba</u>

<u>Caesar's Palace Hotel & Casino</u>v. <u>Costa,</u> No. 02-679, U.S. Law Week, Vol. 71, 4434, which

analyzed Section 2000e-2(m), and said:

"This case provides us with the first opportunity to consider the effects of the 1991 Act on

jury instructions in mixed-motive cases. Specifically, we must decide whether a plaintiff must

present direct evidence of discrimination in order to obtain a mixed-motive instruction under 42

U.S.C. Section 2000e-2(m)…

…Section 2000e-2(m) unambiguously states that a plaintiff need only demonstrate that an

employer uses a forbidden consideration with respect to any employment practice…".

The Court then proceeded to hold that direct evidence of discrimination did not have to be

adduced and that "…a plaintiff need only present sufficient evidence for a reasonable jury to

conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin

was a motivating factor for any employment practice."…"

There can hardly be any doubt that the plaintiff has adduced more than sufficient evidence,

both direct (such as when defendant Dorsey said derisively on the parking lot that Mr. Boyle

could no longer bring his Bible into the Detention Center, and when the Warden said that it was

not Mr. Boyle's job to save the inmates) and indirect (such as being constantly called "Bible

man" , "Bible thumper", "religious freak" (Ex. 11 and 12) and, for a very religious man who

considers it his duty to spread the word of God and to use religion effectively in his work to

bring a level of peace to an environment rarely peaceful, and other evidence in the affidavits and

exhibits filed in this case), to get this case to trial on the basis of religious harassment. That is

especially so when all inferences from the evidence are to be granted the non-moving party, the

plaintiff herein. It is significant that the Supreme Court in the <u>Desert Palace</u> case, supra, cited

<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000), saying "…we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of *circumstantial evidence* that is probative of intentional discrimination" Id., at 147 (emphasis added). The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R. Co.*, 325 U.S. 500, 508, n.17 (1957)." The plaintiff argued, and quoted extensively from, the <u>Reeves</u> case in the plaintiff's Memorandum in Support of Answer to Motion to Dismiss, as it is very important and applicable now, but will not quote from it again here for redundancy and lack of space.

**C.      BOYLE CAN BRING FEDERAL CLAIMS AGAINST SHERIFF MEADOWS AND HIS STATE CLAIMS ARE NOT LIMITED TO THOSE OCCURRING AFTER DECEMBER 13, 1999.**

The Motions to Dismiss filed separately by the State of Maryland and by Harford County each pointed to the other as the employer of the individual defendants. The Court then ordered bifurcated discovery, to limited on the one hand so as to determine which governmental unit was the individual defendants' employer. Thereafter, a hearing was held at which time the state and county changed their arguments somewhat by asserting that the Sheriff of Harford County was the plaintiff's and individual defendants' employer and that he was an independently elected official, not an employee of the state or the county, and therefore all defendants should be dismissed as the Sheriff, the proper defendant, was not sued, and it was too late to do so under the deadline to do so in the Scheduling Order in the case. Despite the defendants' protestations to the contrary, the Court gave the plaintiff leave to implead the Sheriff, which was promptly done.

After their aforesaid sleight of hand, the defendants now want the Court to rule that, although it then allowed the plaintiff to sue the Sheriff, it was too late to do so as the 90 days allowed to do so after receipt of the "right to sue letter" from the EEOC had run. For the reasons asserted by the plaintiff at the aforesaid hearing when he sought leave of the Court to bring the Sheriff of Harford County into the case,  equitable tolling and fairness should prevail. The Court then agreed, and the former Sheriff is now a defendant in this case. The same should now apply to the 90 day filing requirement, not only because it is equitable to do so, but because the Sheriff is simply the nominal party on behalf of Harford County. The Court, in effect, ruled that when it held the Sheriff to be an employee of Harford County when performing administrative tasks operating the Harford County Detention Center, and that Harford County would be responsible for any damages assessed against the Harford County Sheriff. Harford County was the named Respondent in the (Maryland Commission on Human Relations) MCHR/EEOC Charge of Discrimination, and the Sheriff now simply stands in for Harford County in this case. They are, for all practical purposes in this case, one and the same. In other words, for purposes of this suit, the Sheriff is substituting for Harford County and constitutes little more than a name change. Thus, the Court should rule within its discretion, and be consistent, that the Harford County Sheriff is a proper defendant herein, the aforesaid 90 day provision notwithstanding.

Such a ruling would moot the defendants' argument that, since the Sheriff was brought into the case on or about December 13, 2002, state tort or Section 1983 claims against him can go back only to December 13, 1999. As many of the acts complained about were in 1998 and 1999, ruling in favor of the defendants would negate most of the plaintiff's claims. For all of the reasons stated in the immediately prior paragraph hereto, all of plaintiff's claims should be permitted to be pursued against the Harford County Sheriff.

**D.     THE TITLE VII CLAIMS HAVE NOT FAILED AS THERE HAS BEEN AN EXHAUSTION OF THE ADMINISTRATIVE REMEDIES.**

As the defendants stated in their Memorandum, two purposes are served by permitting suit against only those named in an administrative charge filed with the EEOC: (1) it notifies the charged party of the asserted violation and (2) it permits the effectuation of the primary goal of securing voluntary compliance with the law. Dickey v. Greene, 710 F. 2d. 1003, 1005 (4th Cir. 1983) Consider the effect of Mr. Boyle not having named the individual defendants in the Charge of Discrimination: (1) No prejudice has been imposed on the individual defendants because there is nothing they would or could have done which would have resulted in a better conclusion for them in the administrative proceeding, as the MCHR/EEOC found for the respondents. (2) The non-compliance dealt only with complaints affecting the charging party, Mr. Boyle, and he had been terminated. Therefore, the primary purpose of securing voluntary compliance with the law could not have been accomplished.

Defendants also cite McAdoo v. Toll, 591 F. Supp. 1399 ( D. Md., 1984) which permitted suit against an individuals when not named in the administrative charge where they had interests that were "substantially identical". This Court impliedly recognized that the Sheriff (and other individual defendants) had interests substantially identical with Harford County when it ruled that Harford County would be responsible for any damages assessed against the Sheriff in this case.

**VIII. ALL OF BOYLE'S CLAIMS ARE COGNIZABLE, OTHER THAN HIS TITLE VII CLAIMS AGAINST SUPERVISORS AND HIS CLAIM UNDER CHAPTER 95 OF THE HARFORD COUNTY CODE.**

**A. BOYLE CONCEDES THAT TITLE VII DOES NOT IMPOSE INDIVIDUAL LIABILITY ON SUPERVISORS.**

The plaintiff concedes that no Title VII claims lie against his supervisors, only against the Sheriff and Harford County. Lissau v. Southern Food Service, Inc., 159 F. 3d. 177 (4th. Cir. 1998).

**B.     A CLAIM UNDER ARTICLE 49B SHOULD BE VALID.**

The plaintiff should have a cause of action for wrongful discharge based on a violation of public policy.

While it is undeniable that several cases, including a decision by Your Honor, Judge Legg, in Kerrigan v. Magnum Entertainment, Inc., supra, at 735, held that an action for wrongful discharge is not available in Maryland when there is a remedy under Title VII or Article 49B, plaintiff respectfully urges, as unlikely as this may be, that the Court adopt a contrary decision in this case. (The Court upheld the employee's suit in Kerrigan because the employer had fewer than fifteen employees and was not covered by the remedies of Article 49B.) Logic, valid legal analysis, and good public policy strongly suggest that the existence of some limited statutory remedy should not bar a common law abusive discharge action.

Plaintiff urges the Court to realize that by following Kerrigan and other cases in accord therewith it is actually denying the plaintiff the full relief and benefits of the public policy established by the Maryland General Assembly and the Congress. The very convincing dissent in Makovi v. Sherwin-Williams Co., 316 Md. 603, 627-646 (1989) said, at 630,  "Ironically, however, the majority (of the court) makes the statutes that establish the public policy, allegedly contravened here, the means of depriving Makovi of the benefits of an abusive discharge action.

It does so by limiting the scope of the public policy to the statutory remedies provided by Title VII and Article 49B."

When enacted by the Maryland Legislature, Article 49B was modeled after Title VII and cases cited on page 630 of <u>Makovi</u> have construed Article 49B by relying upon the interpretation of Title VII. <u>Willis v. State</u>, 302 Md. 363 at 375 (1985) recognized the principle that two statutes in *pari materia* should be interpreted in similar fashion. Since "Cases dealing with Title VII demonstrate that its limited administrative remedies are not exclusive with respect to one who charges employment discrimination, nor do they mark the outer boundaries of relief for one who has been harmed by gender bias in employment; Article 49 B should similarly not be held exclusive. In <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36 (1974), at 45, the Supreme Court, in determining if the remedies provided by Title VII were exclusive and barred an independent cause of action, explained the importance of the independent cause of action as "…an essential means of obtaining judicial enforcement of Title VII…" and as a means of allowing a private litigant to vindicate "…the important Congressional policy against employment discrimination practices." The court concluded that Title VII afforded the plaintiff independent remedies, recognizing that the policies underlying Title VII would be promoted by the enforcement of discrimination claims in different forums.

The federal courts have so found on numerous occasions. See <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454 (1975), <u>Patterson v. McLean Credit Union</u>, ___ U.S. ___ (1989), <u>Napoleon v. Xerox Corp.</u>, 656 F. Supp. 1120 (remedies under Title VII and Section 1981 were independent), <u>International Union of Electrical Workers v. Robbins and Meyers</u>, 429 U.S. 229 (1976) (grievance procedures under a collective bargaining agreement and Title VII are independent remedies), <u>Johnston v. Harris County Flood Control District</u>, 869 F. 2d. 1565 (5th

Cir., 1989), <u>Keller v. Prince Georges County, Maryland</u>, 827 F. 2d. 952 (4th Cir., 1987)

(remedies under Title VII and Section 1983 are independent), <u>Zombro v. Baltimore City Police</u>

<u>Department</u>, 868 F. 2d. 1364 (4th Cir., 1989 – Judge Murnaghan) ("…Congress clearly believed

that the need to retain a variety of methods to combat discrimination outweighed the risk that

multiple remedies would undermine Title VII's comprehensive enforcement mechanism."), <u>Hall</u>

<u>v. Board of County Commissioners of Frederick County</u>, 509 F. Supp. 841 (D. Md. 1987) (Title

VII and state contract claims are independent remedies, notwithstanding that the same

circumstances gave rise to both).

 In <u>Lucas v. Brown & Root, Inc.</u>, 736 F. 2d. 1202 (8th Cir. 1984) the court recognized an

employee's right to bring a sex discrimination case in tort for wrongful discharge, holding that

Title VII does not preclude such a cause of action because employers are not exempt from

liability or penalty "provided by any present or future law of any state".

 This non-exclusivity of remedies interpretation of Title VII is equally applicable to Article

49B. Maryland's highest court found that the Maryland General Assembly did not intend in

enacting Article 49B to preempt the field of employment discrimination. <u>National Asphalt v.</u>

<u>Prince Georges County</u>, 292 Md. 75, at 79-80 (1981), relying largely upon the fact that the

Maryland Commission on Human Relations "continuously operated on the premise that the

General Assembly did not intend to preempt the field…The consistent construction by the

agency responsible for administering a statute is entitled to considerable weight." In <u>Maryland-</u>

<u>National Capital Park and Planning Commission v. Crawford</u>, 307 Md. 1 (1986), Maryland's

highest court again held that an employee need not exhaust her/his administrative remedies

before filing suit, saying "… Nothing in the 1965 statute (which adopted the employment

discrimination provisions of Article 49B), in the then existing provisions of Article 49B, or in

any subsequent enactments by the General Assembly, remotely indicates that the administrative

enforcement machinery in Article 49B must be invoked prior to pursuing a specific independent

judicial remedy." Supra, at 24.

As footnote 7 on page 637 of the dissent in <u>Makovi</u> points out, other state and federal courts

have read human relations and other acts to confer exclusive jurisdiction on an administrative

agency only when such an exclusivity provision is very clear. That same footnote cites the

Maryland statutes which have such clear exclusivity provisions, so the Maryland General

Assembly knows how to enact one when it means to do so. It obviously didn't mean to do so

when adopting or amending Article 49B.

The Supreme Court has specifically recognized the limited remedial authority of the

Maryland Human Relations Commission under Article 49B. <u>Burnett v. Grattan</u>, 468 U.S. 42, at

53 (1984), "A common law abusive discharge action seeks relief essentially of a different kind

and much more extensive than any remedy afforded by Article 49B."

<u>Dillon v. Great Atlantic and Pacific Tea Company</u>, 43 Md. App. 161 (1979), involved handicap

discrimination, but the court held that Article 49B did not create a private cause of action of that

type, and the administrative remedy had to be followed. As in <u>Makovi</u>, however, Mr. Boyle is

not here asserting a private cause of action created by Article 49B. His "suit is based on a

common law action, recognized by this court in <u>Adler</u>, one element of which involves violation

of the clear mandate of the public policy established by Article 49B and Article 46 of the

Declaration of Rights. Given the established absence of legislative preemption and related

doctrines, as well as the established availability of diverse remedies for employment

discrimination, it is difficult for me to follow the majority's argument that the statute

establishing the policy against employment discrimination itself operates to bar the common law remedy." Makovi, supra, dissent at 639.

There is nothing in the legislative history to suggest that the General Assembly "…meant to prevent the judicial award of damages, or that it  established the anti-discrimination policy only to the extent that it could be vindicated by a limited administrative remedy." Makovi, supra, dissent at 642-643.

"The availability of multiple or parallel remedies may deter future discrimination and may assist in the combat against entrenched existing discriminatory practices in employment. The availability of the common law remedy supplements rather than hinders the goals of the statutes." Makovi, supra, dissent at 644.

"The common law remedy should be open to victims of employment discrimination because the remedies available under the statutes often fail to capture the personal nature of the injury done to a wrongfully discharged employee as an individual and the remedies provided by the statutes [may] fail to appreciate the relative dimensions of the problem. Reinstatement, back pay, and injunctions [may] vindicate the rights of the victimized group without compensating the plaintiff for such personal injuries as anguish, physical symptoms of stress, a sense of degradation, and the cost of psychiatric care. [In such cases] legal as well as equitable remedies are needed to make the plaintiff whole." Makovi, supra, dissent at 645.

Owen v. Carpenters District Council, 161 F. 3d. 767 (1998) held that federal law does not preempt a claim under Maryland common law for wrongful discharge in violation of public policy.

Assuming the existence of a common law action for wrongful discharge, plaintiff can indeed prove that he was terminated for discriminatory and retaliatory reasons. Reasonable jurors could

so conclude, especially since the very recent <u>Reeves</u> and <u>Desert Palace</u> decisions, supra, and should be given the opportunity to do so.

### C. BOYLE MUST CONCEDE THAT HE CANNOT ASSERT A CLAIM UNDER CHAPTER 95 OF THE HARFORD COUNTY CODE, BUT HE SHOULD BE GIVEN LEAVE TO AMEND HIS COMPLAINT.

Reluctantly, Mr. Boyle must concede that a claim which he had every reason to believe he had under Chapter 95 of the Harford County Code evaporated only six months ago when the Court of Appeals of Maryland decided <u>H. P. White Laboratory, Inc. v. Blackburn</u>, 372 Md. 160, 812 A. 2d. 305 (2002). The "Express Powers Act" enables charter home rule counties, such as Harford County, to enact those local laws which the General Assembly expressly allows them to enact. The Legislature enabled several counties to enact laws such as Chapter 95 of the Harford County Code, but Harford County was not one of them. (See Article 49B, Sections 42 and 43 of the Annotated Code of Maryland.) Furthermore, the Court of Appeals ruled that Chapter 95 was not a local law, and, for both reasons, is therefore unconstitutional.

The plaintiff had no way to anticipate this. He had every right to think he was protected by the local law and had a cause of action under it. In fact, two courts, the trial court and one appellate court, ruled that the plaintiff's claim in <u>Blackburn</u> under Chapter 95 of the Harford County Code was valid.

As a result of this unexpected development, the plaintiff should be given leave to amend his Complaint to include a count under 42 U.S.C. Section 1985, Conspiracy to interfere with civil rights, one of the federal whistle blower statutes. That would allow him to proceed with a claim essentially the same as one all parties should have expected to have been viable. Defendants cannot claim any prejudice if such an amendment is permitted, as they are charged with

knowledge of the law and should have known that Harford County and the federal government had enacted whistle blower statutes that protected the plaintiff against violations thereof. No additional discovery would be necessary because of such an amendment. It is of little practical consequence to the defendants whether the plaintiff proceeds under the federal or local statute banning essentially the same conduct. In order to do justice in this case, which cries out for its day in court, the amendment should be permitted.

## CONCLUSION

Summary judgment should not be granted to the employer when the employee produces "… enough evidence to cast doubt on the employer's stated reason (for an adverse employment action), [then] the case should go to trial." Moore's Federal Practice, Section 56.15[3], at 469-472.

"Employment discrimination cases center around a single question: Why did the employer take an adverse employment action against plaintiff? Because this "is clearly a factual question," *Chipollini*, 814 F. 2d. at 899, summary judgment is in fact rarely appropriate in this type of case. Simply "by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." Marzano v. Computer Science Corp., Inc., 91 F. 3d. 497, 509-510 (3d. Cir. 1996).

Considering all of the above arguments, the affidavits and exhibits attached hereto and to the plaintiff's Answers to Motions to Dismiss, and all pleadings and other matters which are of record in this case, there are a multitude of genuine disputes about material facts, and judgment should not be rendered for the defendants as a matter of law. It would be so unjust if the plaintiff, grievously harmed by the defendants, was not permitted his day in court.

In addition, the plaintiff should be granted leave to amend his Complaint to include a count under 42 U.S.C. Section 1985, one of the federal whistle blower statutes.

Respectfully submitted,

_____/S/_____
Howard J. Needle
1321 Harden Lane
Baltimore, Maryland 21208
Phone: (410) 484-8701
Fax: (410) 484-8703
Email: HowardNeedle@aol.com
Federal Bar No. 2904
Counsel for plaintiff

CERTIFICATE OF SERVICE

I hereby certify that this Memorandum in Support of Answer to Motion for Summary Judgment was filed electronically and a copy was mailed this 17th day of June, 2003 to:

Deborah S. Duvall, Esq.
Philip S. Roberts, Esq.

Harford County Law Department
220 Main St.
Bel Air, MD 21014
Counsel for Harford County

and

Frank W. Mann, Esq.
Assistant Attorney General
200 St. Paul St., 20th floor
Baltimore, MD 21202
Counsel for the individual defendants


_____/S/_____
Howard J. Needle